CONSOLIDATED RAIL CORPORATION et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents,

Commonwealth Edison Company et al., General Electric Company, GPU Service Corporation et al., Intervenors.

No. 80–1709.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1980.

Decided Feb. 26, 1981.

As Amended on Denial of Rehearing April 3, 1981.

Michael Boudin, Washington, D. C., with whom J. Mark Iwry, Washington, D. C., Harry N. Babcock, Cleveland, Ohio, and Richard W. Kienle, Roanoke, Va., were on the brief for petitioners.

Joseph H. Dettmar, Atty., I. C. C., Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Dept. of Justice, Richard A. Allen, Gen. Counsel, Henry F. Rush, Associate Gen. Counsel, I. C. C., John J. Powers, III, and James Laskey, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents. Robert S.

Burk and H. Glenn Scammel, Attys., I. C. C., Washington, D. C., also entered appearances for respondent, Interstate Commerce Commission.

Harry H. Voigt, Washington, D. C., with whom Leonard M. Trosten and Michael F. McBride, Washington, D. C., were on the brief for intervenor, Commonwealth Edison Co., et al.

Donald Macleay and James F. Bromley, Washington, D. C., were on the brief for intervenor, General Elec. Co.

Charles J. McCarthy, Washington, D. C., was on the brief for intervenor, GPU Service Corp., et al.

Before ROBINSON and WALD, Circuit Judges, and JUNE L. GREEN *, United States District Judge for the District of Columbia.

WALD, Circuit Judge:

Petitioner railroads [1] seek judicial review of certain orders of the Interstate Commerce Commission [2] ("ICC" or "Commission") concerning railroad rates for transporting hazardous radioactive materials throughout the eastern United States. The Commission found that petitioners' tariffs were based on a special train service which was unnecessary and wasteful and cancelled the petitioners' tariffs, replacing them with prescribed, lower tariffs based on regular trainload service. We hold that the ICC acted properly in determining, on the record before it, that the use of special train service was unnecessary, and we therefore affirm the orders of the Commission.

## I. BACKGROUND

For a number of years, petitioner railroads have transported spent nuclear fuel [3] from nuclear-powered electric generating plants and nuclear-powered vessels to reprocessing plants, waste storage facilities, and commercial burial sites. Transporting spent nuclear fuel is potentially dangerous, since a train derailment, collision, sabotage, or terrorism could result in lethal and environmentally destructive radioactive leakage.[4] For this reason both the Nuclear

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The same railroads that are petitioners in this review proceeding participated in the proceeding below. They are: The Akron, Canton & Youngstown Railroad Co.; The Baltimore & Ohio Railroad Co.; Bangor and Aroostook Railroad Co.; Bessemer & Lake Erie Railroad Co.; Boston & Maine Corp., Robert W. Meserve and Benjamin H. Lacy, Trustees; Central Vermont Railway, Inc.; The Chesapeake & Ohio Railway Co.; Consolidated Rail Corp.; Delaware & Hudson Railway Co.; The Detroit & Toledo Shore Line Railroad Co.; Detroit, Toledo & Ironton Railroad Co.; Grand Trunk Western Railroad Co.; The Long Island Railroad Co.; Main Central Railroad Co.; Norfolk & Western Railway Co.; The Pittsburgh & Lake Erie Railroad Co.; Richmond, Fredericksburg & Potomac Railroad Co.; and Western Maryland Railway Co.

2. The principal order of the ICC under review here is entitled Trainload Rates on Radioactive Materials, Eastern Railroads, 362 ICC 756 (Investigation and Suspension Docket No. 9205) (served May 2, 1980) (hereinafter "Eastern Railroads"). Related to this decision are three others, all with the same caption and ICC Docket Number. Their service dates are May 30, 1980; July 17, 1980; and August 13, 1980.

3. Spent nuclear fuel consists of irradiated nuclear fuel assemblies or rods which have been removed from nuclear reactors after being used to power them. Other, far less radioactive wastes include "closure heads" and "core barrels," which are operational equipment used to handle spent fuel, as well as uniforms, clothing, tools and other material exposed to radioactivity. The railroads have not claimed that the transportation of these other items by regular train service raises a significant safety issue. This case therefore centers only upon the potential hazards of transporting spent nuclear fuel.

4. It has been estimated that the following effects might result from the successful sabotage of a spent nuclear fuel container:

[T]here could be upwards of 1600 early deaths following an attack and upwards of 11,000 latent cancer deaths. New York City's Bureau for Radiation Control projected 1300 early deaths and upwards of 169,000 latent cancer deaths. Both figures were based on high population densities typical of about 140 American urban areas.

The penetration of the typical spent fuel cask is deemed credible. It would release radioac-

Regulatory Commission ("NRC") and the Department of Transportation ("DOT") have required that spent nuclear fuel be transported in agency approved, heavily shielded containers, or "casks," each of which weighs approximately 300,000 pounds and carries a payload of up to approximately 60,000 pounds. *Eastern Railroads, supra,* 362 ICC at 761. *See generally infra* at n.13. According to the ICC, the federal government is currently the only railroad customer making significant shipments of spent nuclear fuel, 362 ICC at 762, and it imposes different railroad safety restrictions[5] on the shipping of its cargo than the NRC and DOT have required for shipments of spent fuel generally. However, the federal government apparently will not remain the sole shipper of spent fuel for long, since the ICC found that "nuclear reactor operators will soon have to make such shipments if they are to continue operating, as their local storage at plant locations is limited." *Id.* at 762–63.

During the 1960s and into the 1970s petitioner railroads maintained a practice of "flagging out," or abstaining from listing in their published tariffs, the rates for carriage of nuclear materials. The railroads did transport such material, however, under specific contractual arrangements with individual shippers.[6] In 1978, the ICC put an end to the railroads' "flagging out" practice, and held that the railroads were "required under their common carrier duty to handle the involved commodities and to publish reasonable and otherwise lawful tariff provisions covering such transportation and . . . their failure to do so violates sections 1(4) and 6(1) of the act and the national transportation policy." *U.S. Energy Research and Development Administration v. Akron, Canton and Youngstown Railroad Co.,* 359 ICC 639 (1978), *aff'd sub nom. Akron, Canton & Youngstown Railroad Co. v. ICC,* 611 F.2d 1162 (6th Cir. 1979), *cert. denied,* —— U.S. ——, 101 S.Ct. 97, 66 L.Ed.2d 34 (1980).

tive solid material and respirable gases and other radioactive particulate matter. . . . Surface winds and later upper atmospheric winds will disperse the radioactive "plume" or cloud over large distances, contaminating large numbers of people not in the vicinity of the attack. Street caverns, subway tunnels and office buildings can capture and concentrate some of the radioactive materials. Nuclear Waste Transportation Safety Act of 1979, Hearings on S. 535 Before the Subcommittee on Science, Technology and Space of the Senate Committee on Commerce, Science and Transportation, 96th Cong., 1st Sess., 189 (July 19, 1979) (testimony of Richard Pollack). Mr. Pollack is Director of the Critical Mass Energy Project in Washington, D. C., a consumer organization, and member of an Advisory Task Force to the Sandia National Laboratories which recently completed a study for the NRC of the environmental effects of transporting radioactive materials through urban areas. *See* 46 Fed.Reg. 5299 (Jan. 19, 1981).

*See also* Verified Statement of Richard B. Hasselman, Senior Vice President, Operations, Consolidated Rail Corp., I J.A. at 71 ("In the event of an accident [involving radioactive materials in rail transit,] the scope and extent of the consequences, expenses and damages that could result would be far greater than those involved in transporting any other type of freight.").

5. Evidence in the record indicates that the federal government currently requires that its radioactive material shipments must not be al-

lowed to roll free in switching operations; must keep to a minimum the number of coupling and uncoupling operations; and must have train speed restricted to 35 MPH. *See* Verified Statement of Melvin O. Benson, General Superintendent of Transportation, Chessie System, I J.A. at 53. Shipments of radioactive materials by the Departments of Energy and Defense, however, are exempt by regulation from DOT rules regarding the transportation of radioactive materials, when such shipments are "for the purpose of national security" and are escorted by designated personnel. *See* 49 C.F.R. §§ 173.7(b); 177.806(b) (1979); 46 Fed. Reg. 5312 (Jan. 19, 1981).

6. The Sixth Circuit has described these private contracts as typically containing the following clauses:

(1) making service at the will of the carriers;
(2) limiting the carrier's own liability in case of rail mishaps involving nuclear material;
(3) obliging the shipper to obtain connecting-line rail service; and
(4) requiring special train service for the carriage of reactor waste. The special trains in this service would comprise less than five cars, and would move only at low speeds over specially designated routes.

*Akron, Canton & Youngstown Railroad Co. v. ICC,* 611 F.2d 1162, 1168 (6th Cir. 1979), *cert. denied,* —— U.S. ——, 101 S.Ct. 97, 66 L.Ed.2d 34 (1980).

To comply with the ICC order, petitioner railroads filed tariffs applicable to shipments of spent fuel. Those tariffs—the ones at issue in this case—were premised on the use of "special train service" (hereinafter "STS").[7] Objections to the STS-based tariffs were filed by electric utilities and other shippers. *See generally* Petitioners' Brief at "Certificate Required by Rule 8(c) ...," at unnumbered second and third pages (listing of utilities and shippers). By order dated December 8, 1978, the Commission suspended the operation of the tariffs and instituted an investigatory proceeding which produced the principal decision and order now before this court. On March 15, 1979, the Commission changed its mind, vacated the suspension of the STS tariffs, and the tariffs then went into effect; they have remained in effect until today by order of this court. *See* p. 646 *infra*. In the meantime, evidentiary proceedings in the case went forward. Evidence was submitted in the form of written verified statements of witnesses, both on behalf of the railroads and of opposing shipper interests. Although the Commission's customary practice is for an Administrative Law Judge to render an initial decision, in this case the Commission chose to consider the matter *ab initio*.

On May 2, 1980, the Commission held, *inter alia*,[8] that petitioners' published tariffs, based on STS, were unreasonably high, thereby violating 49 U.S.C. § 10701(a). *Eastern Railroads, supra*, 362 ICC at 775; *see generally* p. 11 *infra*. The Commission first decided that "safety evidence may be given full probative weight by us without

infringement upon the jurisdictional province of NRC and DOT. The safety matters will be considered in our determination of the justness and reasonableness of the initial rates in issue." *Id.* at 759. Then, reviewing the safety evidence before it, the Commission determined that

> All available evidence supports the finding that, especially because of the ability of the casks to withstand stress, use of special trains provides no cognizable safety benefit.... [W]e are not prepared to allow respondents to require a service which is several times as costly as regular service without (any) commensurate safety benefits.... Thus, we (must) find that, based on the evidence at hand, the special train requirement is wasteful transportation and an unreasonable practice in violation of Section 10701(a) of the act.

*Id.* at 773 (parentheses in original).

The Commission based this factual determination primarily on evidence it drew from its previously issued Environmental Impact Statement (EIS), *see* n.7 *supra*, which specifically addressed the relative safety of STS and regular trainload service for radioactive material. *Eastern Railroads, supra*, 362 ICC at 771–73. The Commission declared that "we have strong evidence derived from the EIS that special train service would be for all practical purposes no safer than regular train service." *Id.* at 773. The Commission supported its safety conclusions by referring to testimony provided by the shippers in the instant proceeding that STS was unnecessary, and by citing a previous ICC decision [9] which re-

---

**7.** Special train service has the following characteristics: no freight other than spent fuel or radioactive waste is carried; spent fuel is carried within government approved casks which are placed on a flat car with a buffer car placed on either side; other radioactive wastes are shipped in containers in boxcars; the train has a caboose with personnel aboard who can observe the radioactive shipment while in transit; speed is restricted to 35 MPH; and when a special train carrying spent fuel or radioactive waste is passed by another train, one of the trains remains standing while the other train passes at a speed not faster than 35 MPH. *See* ICC Office of Proceedings, Transportation of

Radioactive Materials by Rail, Final Environmental Impact Statement 1–8 (service date August 23, 1977) (hereinafter "EIS").

**8.** The Commission went on to decide that it should prescribe a particular rate for regular trainload service for spent fuel. That determination is not an issue in this appeal.

**9.** The Commission cited Radioactive Materials, Special Train Service, Nationwide, 359 ICC 70 (decided March 8, 1978) (hereinafter "Nationwide"), where STS tariffs proposed by southern and western railroad companies for the carriage of radioactive materials were rejected

jected STS tariffs for other railroads located in the south and west. *Id.* at 764, 773.

Following the ICC's May 2 order, petitioner railroads asked this court[10] to set that order aside. The railroads also sought a stay from the Commission pending judicial review in order to continue special train service and tariffs in the interim, but the ICC Chairman denied the request by order served May 30, 1980. I Joint Appendix (hereinafter "J.A.") at 181.[11] On August 15, 1980, this court stayed the ICC order of May 2, pending judicial review, and ordered the case expedited.

The railroads have argued to this court that the Commission lacks authority to second-guess the railroads' "rational judgment" on an "operational" issue such as the need for STS. Petitioners' Brief at 19–25. Alternatively, they contend that even if the Commission has authority independently to evaluate the need for STS, the Commission's factual conclusion that STS was unnecessary was arbitrary and capricious. The railroads especially criticize the ICC's reliance upon the EIS, asserting that they had no notice that the EIS would be considered, and further claiming that it is unreliable, outdated, and unpersuasive when compared to the evidence which they have submitted.

The intervenor shippers, on the other hand, argue that the Commission's review of the safety evidence was outside its power, not because it engaged in a *de novo* safety determination in derogation of the railroads' operational judgment, as petitioners assert, but rather because it engaged in an examination of safety in derogation of the authority of DOT and NRC. According to intervenors, Congress vested exclusive jurisdiction over the issue in this case—the need for STS transportation of radioactive materials—with the NRC and DOT. The ICC's role was limited, they contend, to deciding whether its sister agencies had mandated, or implied approval of, STS; since they did neither, the railroads' tariffs requiring customers to pay for such service was *per se* unreasonable and the ICC was bound to so hold. If the railroads are convinced that the NRC/DOT regulations fail to guarantee adequate safety, claim the intervenors, then they must pursue the remedies available to them before those two agencies. "The railroads' so-called safety evidence should not even have been considered by the [ICC]," they say, "because it has no jurisdiction to impose or permit different standards." Intervenors' Brief at 14.

Somewhere between the railroads and the shippers stands the ICC, which argues that it properly considered all available safety evidence to determine whether tariffs covering the cost of STS were reasonable, and that the course it followed was the only one consistent with its statutory responsibility "to promote safe, adequate, economical, and efficient transportation" and to prevent unreasonable rates and practices from being imposed upon rail users. 49 U.S.C. §§ 10101(a); 10701(a). The Commission further contends that its reliance upon the EIS was entirely correct, and that ample evidence existed to support its factual conclusion that STS is unnecessary, and the tariffs based upon it unreasonable.

by the Commission. The *Nationwide* opinion stated that shipments of radioactive materials in regular train service met all DOT and NRC safety requirements, and then went on to agree with the Administrative Law Judge—and its staff's conclusions in the EIS—that special trains were not materially safer. *Id.* at 74–75. In an earlier case on a related topic, Radioactive Materials, Missouri-Kansas-Texas Railroad Co., 357 ICC 458 (decided November 8, 1977), the Commission held that the railroads could not refuse to perform their common carrier duty to transport spent nuclear fuel by regular train service on the ground that it was not sufficiently safe, since such service complied with applicable DOT and NRC safety regulations.

**10.** This court's jurisdiction to hear this appeal is based upon 28 U.S.C. § 2342(5).

**11.** The Commission served a further order on July 17, 1980, which (1) corrected an error in the May 2 order; (2) briefly deferred the date for filing new tariffs; and (3) reopened the proceedings to evaluate or prescribe further rates for other weights of shipments. *See* I J.A. at 183. The further proceedings contemplated by the Commission are not relevant to this appeal.

The basic issue in this case is whether the ICC properly determined that the railroads' tariffs based on STS were unreasonable. In resolving it, we must answer two questions: first, to what extent did the ICC have authority independently to evaluate the need for STS safety measures; second, was there sufficient evidence [12] in this record to support the Commission's conclusion that STS was unnecessary as a safety measure.

## II. SCOPE OF ICC AUTHORITY IN THIS CASE

The Interstate Commerce Commission, the oldest of all independent federal regulatory agencies, has a venerable, well-settled mandate to establish revenue levels for the railroads that are "adequate, under honest, *economical, and efficient management,* to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business." 49 U.S.C. § 10704(a)(2) (emphasis supplied). Every "rate" and every "practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission ... must be reasonable." 49 U.S.C. § 10701(a). Long ago the Supreme Court made it clear that "[no] party has a right to insist upon a wasteful or excessive service for which the consumer must ultimately pay." *Atchison Railway Co. v. United States,* 232 U.S. 199, 217, 34 S.Ct. 291, 295, 58 L.Ed. 568 (1914). *See also Ayrshire Collieries Corp. v. United States,* 335 U.S. 573, 592, 69 S.Ct. 278, 288, 93 L.Ed. 243 (1949); *Alabama Great Southern Railroad Co. v. United States,* 88 F.Supp. 982, 988 (N.D.Ill.), *aff'd,* 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1950); *Akron, Canton & Youngstown Railroad, Routing on Overhead Traffic,* 302 ICC 465, 467 (1957) (preventing railroad from using particular "routes [which] would result in wasteful transportation and would not be in the public interest.").

■ It is true, of course, as the railroads claim, that under the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.,* a zone of reasonableness exists within which the railroads are ordinarily free to set their own rates. *See United States v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 294 U.S. 499, 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023 (1935) (zone of reasonableness ordinarily exists for rates which are neither "less than compensatory" nor "excessive"); *Iron Ore from Cleveland, Ohio,* 323 ICC 746, 752 (1965). But given that this zone indeed exists, the fundamental question still remains whether the STS-based tariffs are "reasonable" as that term has been understood and applied by the Commission for nearly one hundred years. Because it is the Commission's statutory responsibility to ensure that the rates and practices subject to its jurisdiction are "reasonable," petitioners' argument that "the Commission may not disregard the railroads' rational judgment that special trial service be used," must fail. Petitioners' Brief at 24. The question is not whether the decision to use STS can be described as "rational" from the railroads' perspective, but instead whether the practice—and the tariff based on it—is *reasonable* when viewed from the *public* perspective of the Commission, which must reconcile a multitude of factors in exercising its expert judgment on tariff issues, including

12. This court applies a deferential standard when reviewing rate determinations of the ICC. *Houston Lighting & Power Co. v. United States,* 606 F.2d 1131, 1145 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). Our scope of review is delimited by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(D), and we will not disturb railroad rate determinations unless it is shown that " 'they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of [the Commission's]

power.' " *Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973) (plurality opinion) (quoting *Manufacturers R. Co. v. United States,* 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831 (1918)). *See also Asphalt Roofing Manufacturing Ass'n v. ICC,* 567 F.2d 994, 1002 & n.5 (D.C.Cir.1977) (holding that proceedings under § 15(1), the predecessor to § 10704, are reviewable under the "arbitrary, capricious, [or] abuse of discretion" standard of 5 U.S.C. § 706(2)(A)).

economy, efficiency, fair wages and working conditions, and safety, in addition to the financial condition of the carriers. *See* 49 U.S.C. § 10101; *see generally Standards and Procedures for the Establishment of Adequate Railroad Revenue Levels,* 358 ICC 844 (1978); *Potomac Electric Power Co. v. Penn Central Transportation Co.,* 359 ICC 222, 238 (1977) (various "conflicting considerations [in ratesetting] cannot be reduced to a dry, exact, mathematical formula."); *Investigation of Railroad Freight Rate Structure—Coal,* 345 ICC 493, 505–06 (1976).

▪ Since promoting safe rail transportation is one of the Commission's statutory responsibilities, *see* 49 U.S.C. § 10101(a); *Radioactive Material, Missouri-Kansas-Texas Railroad Co.,* 357 ICC 458, 463 (1977), tariffs which reflect the fair cost of reasonable safety procedures, equipment, and personnel will ordinarily be looked upon with favor by the Commission. Clearly a railroad company acts reasonably when it tries to promote the safety of its employees, passengers, and property; the Commission implicitly recognized that in this case: "The railroads have a responsibility to protect their employees, their property and the public from harmful radiation." *Eastern Railroads, supra,* 362 ICC at 772. *See also Lehigh Valley Railroad Co. v. John Lysaght, Ltd.,* 271 F. 906, 910–11 (2d Cir.), *appeal dismissed,* 257 U.S. 613, 42 S.Ct. 53, 66 L.Ed. 397 (1921).

Obviously this does not mean that every cost allegedly incurred for a safety reason need be approved by the Commission. The mere assertion of safety as a justification for any particular expenditure by a railroad company is not conclusive upon the Commission's judgment of the reasonableness of that expenditure or the tariff based upon it. The safety measures for which expenditures are made must be reasonable ones, which means first, that they produce an expected safety benefit commensurate to their cost; and second, that when compared with other possible safety measures, they represent an economical means of achieving the expected safety benefit.

In this case, the ICC was not required to pursue a completely independent evaluation of whether these criteria of reasonableness for safety expenditures were satisfied. This litigation presents a special situation in which two other agencies have been given specific statutory authority to establish safety standards covering the transportation by rail of radioactive material. In the first place, the Secretary of Transportation has primary responsibility for assuring the "safe transportation in commerce of hazardous material." 49 U.S.C. § 1804(a). *See* 49 U.S.C. § 1803 (authorizing the Secretary to designate "radioactive materials" as "hazardous material"). He is authorized to issue regulations governing "any safety aspect of the transportation of hazardous materials which [he] deems necessary or appropriate, including, but not limited to, the packing, repacking, handling, labeling, marking, placarding, and routing ... of hazardous materials, and the manufacture, fabrication, marking, maintenance, reconditioning, repairing, or testing of a package or container which is represented, marked, certified, or sold ... for use in the transportation of certain hazardous materials." 49 U.S.C. § 1804(a). The primacy of the Secretary's authority in this area was confirmed in 1966 by the transfer from the ICC to the Secretary of the responsibility to "formulate regulations for the safe transportation within the United States of explosives and other dangerous articles, including radioactive materials ... which shall be binding upon all carriers ... which transport ... dangerous articles by land ...." 18 U.S.C. § 834(a); *see* P.L. 89–670, 80 Stat. 931 (1966), *codified at* 49 U.S.C. § 1655(e)(4) (transferring to the Secretary of Transportation "all functions, powers, and duties" of the ICC over hazardous articles which are found in 18 U.S.C. §§ 831–835). *See generally Kappelmann v. Delta Air Lines, Inc.,* 539 F.2d 165, 169–71 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977) (discussing the Secretary's "primary authority to regulate 'any safety aspects of the transportation of hazardous materials ....' "). The statute requires that the hazardous articles regula-

tions drafted by the Secretary "shall be in accord with *the best-known practicable means* for securing safety in transit . . . ." 18 U.S.C. § 834(c) (emphasis supplied).

The Nuclear Regulatory Commission also has a statutorily mandated role in implementing safety measures related to radioactive wastes. The NRC is authorized to "establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property[.]" 42 U.S.C. § 2201(b). Congress has determined that the proper balance between adequate safety on the one hand, and promotion of nuclear energy on the other, should lie primarily with the NRC, not with other federal agencies, the states, or the railroads. *See Northern States Power Co. v. Minnesota,* 447 F.2d 1143, 1153–54 (8th Cir. 1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972) ("Congress vested the AEC [now NRC] with the authority to resolve the proper balance between desired industrial progress and adequate health and safety standards.").

Pursuant to these Congressional mandates, both DOT and NRC have promulgated comprehensive regulations concerning the various safety aspects of rail transportation for radioactive materials. Although the division of authority between DOT and NRC concerning regulation of the transportation of radioactive materials is untidy, *see* Transportation of Radioactive Materials, Memorandum of Understanding, 44 Fed. Reg. 38690–38692 (July 2, 1979) (signed by DOT and NRC on June 8, 1979), together their regulatory authority extends over the entire range of safety considerations implicated by the transportation of radioactive wastes. *Id.* at 38690. The Memorandum of Understanding makes clear that although it is DOT's responsibility to "issue *complete and comprehensive* Federal regulations for the packaging and transportation of all radioactive materials as part of its overall body of federal regulations . . . ," the NRC "will adopt packaging standards for . . . radioactive materials . . . and will adopt regulations imposing on its licensees administrative, procedural, and technical requirements necessary to protect the public health and safety . . . ." *Id.* at 38690–91 (emphasis supplied). Pursuant to this arrangement, the NRC has issued regulations governing both the packaging of spent fuel in secure casks,[13] and the shipping of those casks by rail. Included in the latter are requirements for armed escorts, pre-approval of routes, coordination of all shipments with local law enforcement agencies and requirements concerning scheduling of shipments.[14] The DOT also has detailed, extensive regulations governing the preparation, labelling, packaging and transportation by rail of hazardous materials generally, and radioac-

---

13. The EIS describes the cask as follows:
   A spent fuel cask is generally cylindrical with lead or steel shielding and external cooling fins. It is clad inside and out with stainless steel. The inner cavity is large enough to accommodate a specified amount of spent fuel depending on the size of the cask. The space between the inner and outer steel shelves is filled with a dense shielding material, such as lead, uranium, or tungsten. The size of the spent fuel cask can vary between 15 and 100 tons, and can be moved by either truck or rail.
   EIS at 2–3.
   Highly radioactive spent fuel must be enclosed in what the DOT calls "Type B packaging," *See* 49 C.F.R. § 173.389 (1979). Type B packaging must be designed to withstand all normal transport conditions without any loss of contents or shielding efficiency, and to suffer no more than a minimal loss of contents or shielding during a sequence of accident damage test conditions, which include: (1) a free fall from a height of 30 feet onto an essentially unyielding surface with the cask landing in an orientation for which maximum damage is expected; (2) a free fall from a height of 4 feet onto a six inch diameter steel plunger long enough, and with the package in the orientation, to do maximum damage; (3) exposure to fire at a temperature of 1475 degrees Fahrenheit for thirty minutes; and (4) total immersion in water three feet deep for eight hours. *See* 10 C.F.R. § 71.36, Part 71, Appendices A, B (1980) (NRC regulations); 49 C.F.R. § 173.-398(c) (1979) (DOT regulations).

14. *See* 10 C.F.R. § 73.37 (1980), *as amended,* 45 Fed.Reg. 37408–37410 (June 3, 1980).

tive materials specifically.[15] In light of these regulations, the railroads' contention that without STS radioactive materials "would ordinarily be shipped according to the routes, schedules and procedures normally applicable to shipments of other commodities" is without merit. *See* Pet. Br. at 5 n.2. Significantly, neither agency's rules specify the use of STS.

Where DOT and NRC, pursuant to specific statutory authority, have established "complete and comprehensive" safety standards in this particular area, Memorandum of Understanding, *supra*, and have drafted regulations in accord with "the best-known practicable means for securing safety," 18 U.S.C. § 834(c), while balancing the cost of safety with the need for economy, a presumption arises that expenditures for safety measures not specified by these agencies are unnecessary and fail to satisfy the criteria of reasonableness outlined above, *supra* at p. 648, especially when such expenditures inflate shipping costs many times over. The ICC therefore properly defers to the expertise and primary jurisdiction [16] of the NRC and DOT both in determining which particular measures are reasonably required to produce the necessary level of safety, and in deciding whether any particular safety measure will likely produce benefits commensurate with its cost and will be economical.

Only one prior case has faced the issue of the ICC's authority to determine the reasonableness of railroad-proposed safety measures in the carriage of hazardous materials, and the extent of its duties to defer to the expert judgment of DOT/NRC on such matters. In *Akron, Canton & Youngstown Railroad Co. v. I.C.C.*, 611 F.2d 1162 (6th Cir. 1979), *cert. denied*, ── U.S. ──, 101 S.Ct. 97, 66 L.Ed.2d 34 (1980), the decision which affirmed the ICC's earlier order to petitioner railroads in this case to establish "reasonable ... tariff provisions" for transporting spent fuel, *see* note 6 and accompanying text, *supra,* the Sixth Circuit stated,

> The Commission's deference to the safety regulations of its sister agencies must extend only this far: a carrier may not ask the Commission to take cognizance of a claim that a commodity is absolutely too dangerous to transport, if there are DOT and NRC regulations governing such transport, and these regulations have been met.
>
> Such a claim is properly made before the agencies entrusted with promulgating these minimum safety regulations. "A carrier thus cannot refuse to haul any materials which meet [DOT and NRC] standards, but it may seek approval of a stricter practice which is shown to be just and reasonable." [*Radioactive Materials, Special Train Service, Nationwide,* 359 ICC 70, 73 (March 8, 1978).] We hold that the Commission has properly stated its role in regulating safety standards for rail transport of nuclear materials. It is entirely possible that, after the petitioners have published tariffs under which special trains would be required to haul these commodities, the Commission would approve tariffs and rates which would enable the individual railroads involved in *this* proceeding to provide special trains to carry nuclear materials, even though such special trains might not be required nationwide.

611 F.2d at 1169 (footnote omitted).

We agree with the court's analysis, as far as it goes. The railroads may indeed seek to prove the reasonableness of additional safety measures, but the burden is upon them to show that, for some reason, the presumptively valid DOT/NRC regulations are unsatisfactory or inadequate in their particular circumstance.

---

15. *See generally* 49 C.F.R., Part 173 (1979).

16. It is important to note that this case does not present a conflict between two or more agencies over who shall regulate a given safety matter. Clearly that responsibility rests with DOT and NRC in this case. The question before us here is how the ICC should make use of the DOT/NRC standards in deciding a *completely separate issue,* namely, whether the railroads' voluntary attempt to institute and charge for additional safety measures not mandated by DOT or NRC is "reasonable" under the Interstate Commerce Act.

Our position is bolstered further by *Delta Air Lines, Inc. v. CAB*, 543 F.2d 247 (D.C. Cir.1976), where this court discussed an analogous question concerning the role of the CAB in approving certain airline safety restrictions [17] beyond those mandated by Federal Aviation Administration ("FAA") and DOT for transporting hazardous cargo by air. There we said,

> [S]afety has already been determined by the agencies charged with primary responsibility in this area, the FAA and the DOT. While the CAB is instructed by section 102 of the Federal Aviation Act to "consider . . . as being in the public interest, and in accordance with the public convenience and necessity: . . . [1] The regulation of air transportation in such a manner as to . . . assure the highest degree of safety in . . . such transportation . . . [and] [2] The promotion of safety in air commerce . . ., it is clear to us that the Board fulfills its responsibilities with respect to safety questions when it determines that all FAA/DOT safety requirements have been satisfied. *Perhaps under section 102 the Board retains a small residue of authority over safety issues whereby it could impose hazardous cargo standards stricter (but not more lenient) than those of FAA/DOT, yet in general we believe that the Board should defer to the safety expertise of its sister agencies and accept the FAA/DOT position on safety as establishing both an inner and an outer limit on its safety jurisdiction.*

543 F.2d at 260 (footnotes omitted; emphasis supplied).[18]

Although a presumption arises from the DOT/NRC regulations that the railroads' expenditures on STS are unreasonable, this does not mean that STS expenditures are in fact not "reasonable" under the Interstate Commerce Act. The ICC must consider the absence of an STS requirement by either DOT or NRC as one important element in reaching its decision whether such service is reasonably necessary for safety reasons, but that fact alone need not always control the outcome. It is possible that the ICC could be presented with evidence rebutting the presumption. For example, it might be shown that DOT and NRC did not intend to establish comprehensive regulations to assure safe transportation of radioactive materials, but rather hoped that other agencies—or private industry—would substantially supplement their regulations; or else it might be shown that the regulations were drafted without any knowledge of the STS option; or that the railroads lacked any meaningful opportunity to present the STS option to DOT or NRC; or that some unusual or special conditions related to petitioners' particular eastern railroad routes made imposition of STS reasonable in their case. No such rebutting evidence, however, was presented in this case.

First, it is clear from the DOT/NRC regulations' comprehensive character that these agencies have attempted to satisfy fully their statutory duty to assure the safe transportation of radioactive materials. *See* p. 649 *supra.* Nowhere in the regulations is there any indication whatever that the agencies viewed them as bare minimums, and intended to satisfy their duties under law by encouraging further substantial safety measures on the part of the railroads, which could increase shipping costs many times over. Rather, we may justifiably assume that the agencies were sensitive to our national policy, declared by Congress, to regulate nuclear energy so as to *simultaneously* protect pub-

---

17. The restrictions amounted to refusals to ship certain types of radioactive materials. 543 F.2d at 256–58.

18. The court noted that "the FAA/DOT safety regulations . . . will constitute part of the evidentiary record in the hearing and investigation we now order the Board to conduct. . . ." 543 F.2d at 269.

We note that *Delta Air Lines* may be distinguished from this case in that *Delta Air Lines* primarily concerned the effect of DOT/FAA regulations upon the requests of certain carriers not to handle certain radioactive cargo at all; that issue has already been settled in this case. *Akron, Canton & Youngstown Railroad Co. v. ICC, supra,* 611 F.2d 1162. In addition, the relationship between the CAB and DOT/FAA may differ from that between the ICC and DOT/NRC, *see id.* at 1170.

lic health and safety *and* promote its development. *See* 42 U.S.C. §§ 2012, 2013; *Northern States Power Co. v. Minnesota*, 447 F.2d 1143, 1153 (8th Cir. 1971), *aff'd mem.* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972) ("Congressional objectives ... evince a legislative design to foster and encourage the development, use and control of atomic energy so as to make a maximum contribution to the general welfare and to increase the standard of living .... However, these objectives were to be effectuated 'to the maximum extent consistent ... with the health and safety of the public.' "). In this case the safety regulations promulgated by DOT and NRC are entitled to be considered by the ICC as embodying *prima facie* the appropriate balance between safety and nuclear development. *Cf.* 49 U.S.C. § 1806 (authorizing exemptions from DOT hazardous materials regulations for shippers who achieve level of safety equal to, or exceeding that expected under the regulations); 49 C.F.R. § 107.-101 *et seq.* (1979) (same).

Second, there is no evidence that these regulations were drafted without specific knowledge of the STS option. On the contrary, the railroads themselves have previously urged NRC to consider this very STS package for the transportation of nuclear wastes. Their suggestion was considered and squarely rejected by the Commission: "Needed protection requirements for rail shipments can be met by regular trains. Accordingly, the suggestion that the regulations be modified to require the use of special trains [is] rejected." 45 Fed.Reg. 37408 (June 3, 1980).[19] The NRC's specific rejection of STS implicitly represented a determination that such service was unnecessary from a safety standpoint, and the ICC should properly have given great weight to such a determination by a sister agency vested with the jurisdiction and expertise to make just such a finding.

Third, the railroads have had, and will continue to have, ample opportunity to petition both the NRC and DOT for review of their respective regulations in this area. Any evidence indicating that significant safety benefits could be achieved by STS may be considered by DOT and NRC pursuant to the procedures each agency has established permitting petitions to issue, amend, or rescind transportation safety regulations. 49 C.F.R. § 106.31 (1979) (DOT); 10 C.F.R. § 2.802 (1980) (NRC). *See also* 18 U.S.C. § 834(b) ("The [Secretary of Transportation on his] own motion, or upon application made by any interested party, may make changes or modifications in such regulations, made desirable by new information or altered conditions.").

Finally, we note the absence of any proffered evidence which might persuade either the ICC or this court that particular, distinguishing characteristics of the eastern railroads made STS necessary for them, but not for railroads generally so as to require DOT/NRC specification of STS nationally. *Cf. Akron, Canton & Youngstown Railroad Co. v. ICC, supra*, 611 F.2d at 1169–70 (inviting the petitioners in this case to make such a showing). In sum, the ICC was entitled in this case to rely on DOT and NRC regulations as establishing a presumption that STS was not reasonably necessary to insure safety, as the railroads asserted it was.

The ICC's opinion, however, reveals that the Commission did not explicitly rely on DOT and NRC regulations to establish a presumption against a need for STS, though it would have been proper to do so. *Cf. Eastern Railroads, supra*, 362 ICC at 759, 764. Instead, the Commission examined the evidence it had before it without resorting to any presumption against STS, and still concluded that STS provided no cognizable safety benefit, and hence that expenditures for it and the tariffs based upon it were unreasonable. We are satisfied from our examination of the record made before the Commission that sufficient evidence existed to support its conclusion that STS was unnecessary for safety reasons, even without the presumption against

---

**19.** *See also* U.S. Nuclear Regulatory Commission, 40 Fed.Reg. 23768, 23770 (June 2, 1975)

(no evidence that present package and security requirements are inadequate).

STS arising from the DOT/NRC regulations, which we believe the Commission should have taken into account.

## III. EVIDENCE SUPPORTING THE COMMISSION'S DETERMINATION

Determining the reasonableness of any expenditure requires a comparison of evidence on cost with evidence on benefit; we therefore analyze each in turn.

The evidence before the Commission related to the cost of STS was largely undisputed. Although the record contained no hard evidence directly comparing the cost to shippers of STS and regular train service, it is clear to us that STS multiplies many times over the cost of transporting spent fuel by rail.[20] Since the railroads' tariffs can be justified *only* on the assumption that STS is needed—and the railroads do not contend otherwise—we may turn immediately to the evidence of alleged safety benefits to be expected from STS. If the evidence shows them to be less than substantial, STS is unreasonable.[21]

### 1. *The EIS*

The primary evidentiary foundation for the Commission's finding that STS is not reasonably necessary as a safety measure is the EIS, *see supra* pp. 645–646, whose conclusions were as follows:

> [S]pecial trains will increase the environmental risks from the non-radiological standpoint and from the radiological standpoint under normal transport conditions. However, special trains will decrease the environmental risks from the radiological standpoint under accident conditions. In all cases, however, the incremental environmental impact of special trains as opposed to regular trains is very small.

EIS at i. Regarding the radiological dangers under accident conditions—the only circumstance under which the EIS found STS to be advantageous—the EIS weighed the likelihood of an accident against the magnitude of any resulting harm, and concluded,

> Model II consequences indicate that regular train accidents would result in ap-

**20.** The ICC concluded:

> The rates published by the respondent railroads are predicated on the cost of special train service. As we have concluded that special train service is not justified, the rate level must be considered in relation to the cost of regular train service. The published rates are clearly unlawful when compared to the much lower cost of regular train service. As stated, the revenue/variable cost ratios approximate 3000%.

*Eastern Railroads, supra,* 362 ICC at 774. *See also* Government Brief at 4. This, however, does not tell us the difference in cost *to the shippers* between regular train service and STS. *Cf.* Verified Statement of Edward R. Reis, Manager-Fuel Supply, Pennsylvania Power & Light Co., I J.A. at 85–6 (rates are "unconscionably high"); Verified Statement of Robert H. Jones, Manager of Transportation Systems, Spent Fuel Services Operation, General Electric Co., I J.A. at 139–40 (estimating that STS would increase costs by two or three times).

The railroads insist that they have no ulterior reason to seek STS, since "there is no profit to the railroads in wasteful practices which increase railroad operating expenses...." Petitioners' Reply Brief at 13. It is true, of course, that the railroads do not invariably profit from wasteful practices *per se*; but it is equally obvious that shippers end up paying for such

practices and it is the ICC's function to prevent that from happening.

**21.** It may be possible, of course, for the railroads to institute other, additional safety measures beyond those required by regulation, but which are not so costly that they cannot be accommodated within the tariff already set by the Commission. The ICC recognized this possibility:

> [W]e are dealing with a commodity which does require additional precautions in some circumstances. *We think it is proper to allow a slightly higher ratio* [in calculating the reasonable tariff] *than we would otherwise allow to give the railroads some latitude in the handling of these commodities.* Obviously, we are dealing here with a particular set of facts and our conclusions are limited to these circumstances. In our view, a rate level of approximately 7 percent of the revenue/variable cost ratio of the column 1820 and 1830 rates would cover all the costs of service and provide an adequate return on all related investments. *In addition, it should give adequate incentive for the railroads to maintain beneficial safety measures* in the transportation of nuclear waste.

*Eastern Railroads, supra,* 362 ICC at 775 (emphasis supplied).

proximately one latent cancer fatality every 1,660 years while special train accidents would result in one latent cancer fatality every 6,250 years. Model I consequences indicate that regular train accidents would result in one latent cancer fatality every half year while special train accidents would result in one latent cancer fatality every five years. EIS at 4–48.[22] Having carefully considered the evidence and conclusions found in the EIS, we agree with the Commission that the EIS provides "strong evidence ... that special train service would be for all practical purposes no safer than regular train service." *Eastern Railroads, supra,* 362 ICC at 773.

The railroads argue that the Commission's reliance on the EIS was improper, since it was not submitted by any party as evidence and no notice was given to the parties that it would be treated as substantive evidence. For this reason, they say, they lacked an opportunity to meet its conclusions. Petitioners' Brief at 35–45. The railroads also attempt to undermine the va-

lidity of the EIS by asserting that it relied upon outdated information, and upon studies not completed when the EIS was prepared. *Id.* at 38.

These arguments are unpersuasive for three reasons. First, petitioner railroads actively participated in the notice and comment procedures prior to the issuance of this EIS. *See* EIS at 9–8. Second, petitioner railroads *had actual notice* that the Commission would use the EIS in future proceedings related to the environmental effect of STS. The tentative draft of the EIS document at issue here—the draft to which the railroads responded with comments—stated on its first page,

> This impact statement is generic in nature, and can be used by the Commission in any proceeding in which the issue is the health and safety effects associated with special rather than regular train service.

Draft EIS at "Summary," p. 1.[23]

The decisive answer to these objections, however, is that the railroads had ample

---

**22.** Models I and II refer to different sets of hypothetical accident circumstances. As the EIS describes them,

> [T]wo different exposure models are considered: (1) Model I—the container completely fails exposing all its contents at a severity level just above the level at which it is required to survive; and (2) Model II—the container partially fails exposing some of its contents just above the level at which it is required to survive.
>
> . . . .
>
> The annual radiological risks given under Model I conditions are much larger than those given under Model II due to the extremely conservative [worst case] assumptions used in Model I. The Model II results are considered a more realistic representation of the consequences of train accidents involving spent fuel or waste shipments.

EIS at 4–46, 4–48. The EIS's conclusions concerning the relative safety impacts of STS and regular train service (under accident conditions) are summarized in the following table:

EIS Table 4.11 *

SUMMARY OF ANNUAL RADIOLOGICAL AND NON-RADIOLOGICAL IMPACTS OF TRANSPORTING *SPENT FUEL OR WASTE* BY REGULAR AND BY SPECIAL TRAINS—ACCIDENT CONDITIONS

| | Radiological Impacts | | | |
| --- | --- | --- | --- | --- |
| | Special Trains | | Regular Trains | |
| Latent Cancer Fatalities | Model I | Model II | Model I | Model II |
| | 0.22 | $1.6 \times 10^{-4}$ | 2.0 | $6.0 \times 10^{-4}$ |
| Early Fatalities | | | | 0 |

| | Non-Radiological Impacts | | | |
| --- | --- | --- | --- | --- |
| | Special Trains | | Regular Trains | |
| | Model I | Model II | Model I | Model II |
| Accident Fatalities | 1.6 | 1.6 | 0 | 0 |
| Grand Total | 1.82 | 1.6 | 2.0 | $6.0 \times 10^{-4}$ |

* EIS at 4–55 (footnote omitted).

**23.** *See also* Draft EIS at 3:

> Although the procedural posture of all these proceedings differs significantly, the same basic question is presented, i. e., whether environmental and safety considerations justify the railroad's proposed requirement that spent nuclear fuel and radioactive waste materials move in special trains as opposed to regular train service. In view of the identical environmental questions raised in each of [these] proceedings, this environmental impact statement is generic in nature, and can be utilized by the Commission in any proceeding which involves the question of regular vs. special train service for the transportation of radioactive materials.

*See also* Draft EIS, "Notice to the Parties," at 1:

opportunity during the course of the proceeding below to contest any and all data underlying the conclusion contained in the EIS. The railroads had to have been aware, both in fact and as a matter of law, that the Commission would rely upon its EIS in this case. The issue raised by the railroads in this case was *identical* to the issue discussed in the EIS, a document which the railroads participated in drafting and which was served upon them. Further, when this matter was being litigated below, the *Nationwide* case, *supra,* 359 ICC 70, was the most recent ICC decision on the issue of STS tariffs, *and there the Commission relied upon the EIS.*[24] Thus the railroads had ample warning that new, persuasive evidence would be needed to undermine the Commission's previously shown reliance upon the EIS. Unless the railroads submitted such evidence, the Commission was entitled to rely on its EIS as a basis for its decision in this case. For the Commission to prepare an extensive and detailed EIS addressed to the very issue of this case and then ignore it in rendering its decision, would be both a waste of its time and resources, as well as contrary to the policies of the National Environmental Policy Act, 42 U.S.C. § 4332. *See generally* Council on Environmental Quality, Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements, 3 Environ.Rep. (BNA) 82, 87 (1972) (recommending that agencies "consolidat[e] numbers of impact statements into fewer but broader and more meaningful reviews."). The Commission was entitled to rely upon its safety findings in *Nationwide*—a proceeding directly relevant to the one *sub judice*—and it was entirely proper for it to apply the expertise and knowledge it had gained in that proceeding to this case, since petitioners were given a full opportunity to contest the earlier findings with new evidence. *See generally United States v. Pierce Auto Freight Lines, Inc.,* 327 U.S. 515, 529–30, 66 S.Ct. 687, 694–95, 90 L.Ed. 821 (1946).

### 2. *Other Evidence*

In addition to witness testimony supporting the conclusion that STS was unnecessary,[25] there was ample, uncontradicted evidence in the record of significant, adverse impacts on shippers which would result from the high STS tariffs.[26] The most important thing to be said about the witness testimony, however, is that the railroads' witnesses failed to present concrete evidence that safety benefits accruing from STS would be significant enough to match

Inasmuch as all of the entitled proceedings present the same environmental questions, one generic impact statement has been prepared and will be used to assess the environmental impacts associated with any environmental proceeding which involves the question of whether health and safety considerations require the utilization of special train service by the Nation's railroads.

24. The railroads can hardly claim to have been surprised that *Nationwide* might be used by the Commission in this proceeding as precedent against them, since their opponents cited *Nationwide* for its holding on the safety issue a number of times in their briefs and papers. *See, e. g.,* Surrebuttal Statement of Protestants Other Than Federal Agencies 9 (I & S Docket No. 9025) (filed June 22, 1979); Reply in Opposition to Petition to Intervene 3 (I & S Docket No. 9025) (filed July 6, 1979) ("the safety issue has been litigated before this Commission on comprehensive records in three different proceedings: [citing *Nationwide*].... [T]hose decisions are important as *stare decisis.*...."); Opposition of the Dept. of Energy to Petition to Intervene 1–2 (I & S Docket No. 9025) (filed July 11, 1979) ("[The *Nationwide* decision is] strong precedent on all fours with the issues of the instant case.").

25. *See* Verified Statement of Clarence E. Jackman, Transportation Consultant, I J.A. 88–98 ("In my opinion the requirement of special train service for radioactive materials is entirely inappropriate and the handling of such commodities in special train service rather than in regular train service would constitute a waste of transportation service." *Id.* at 95); Verified Statement of John C. Sperry, Transportation Consultant, I J.A. 115–22 (agreeing with, and adopting as his own, Mr. Jackman's testimony, while making other remarks against using STS).

26. *See* Verified Statement of James M. Clabby, I J.A. 99, at 108; Verified Statement of George P. Rifakes, I J.A. 123, at 128; Verified Statement of Robert H. Jones, I J.A. 138, at 139–40.

its high cost.[27] Petitioners also failed to show why the comprehensive DOT/NRC regulations currently in effect would not achieve substantially the same benefits as those claimed for STS. In sum, petitioners failed to undermine the Commission's properly grounded confidence either in its prior determination in *Nationwide* that STS was unnecessary, or in its EIS.

## IV. CONCLUSION

This court recognizes the potentially grave hazards which inhere in large-scale rail transportation of highly radioactive materials. Congress has mandated that DOT and NRC take appropriate steps to insure that these hazards are minimized. However, Congress has also required that all tariffs and practices related to rail transportation under the jurisdiction of the ICC be "reasonable." In judging the reasonableness of the tariffs in this case, the ICC was entitled to assume that heavy additional expenditures by the railroads, allegedly for "safety" but mandated neither by DOT or NRC, were presumptively unnecessary and hence unreasonable. Since the railroads failed to present evidence sufficient to rebut that presumption, we believe the Commission acted properly in finding on this record that STS was unnecessary as a safety measure, and that the tariffs based on it were therefore unreasonable. The orders of the Commission are therefore

*Affirmed.*

**27.** The railroads' evidence on the need for STS hinges primarily on the assertion that the casks containing spent fuel are insufficiently secure when they are transported using regular train service. *See generally* Opening Statement of Facts and Argument of Eastern Railroads 12 (ICC I & S Docket No. 9205) (filed Apr. 18, 1979) ("The objective of special train service is to assure insofar as possible that the accident environment will not be more precarious than that contemplated by the cask testing standards [of NRC and DOT].").

The railroads argue at length that certain accident conditions which might occur using regular train service—collisions at 35 MPH or greater, or prolonged fires, for example—could cause dangerous leaks in the casks. Petition-

ers' Brief at 16–19. Clearly, however, all arguments concerning the inadequacy of federal specifications for spent fuel casks must be addressed to DOT and NRC in the first instance. If the cask specifications are inadequate to cope with the exigencies of regular train service—the service by which DOT/NRC evidently expected the casks to travel—then it is DOT or NRC's responsibility to change them, or else change the manner in which the casks are transported. After carefully examining the railroads' evidence, we find that it falls far short of demonstrating either that (a) the DOT/NRC cask specifications are too lax to cope with the exigencies of regular train service, or (b) assuming *arguendo* they are too lax, that the appropriate solution is STS.