The AKRON, CANTON & YOUNGS-
TOWN RAILROAD COMPANY et
al., Petitioners,

v.

The INTERSTATE COMMERCE COM-
MISSION et al., Respondents,

and

GPU Service Corporation et
al., Intervenors.

No. 78–3425.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 22, 1979.

Decided Dec. 20, 1979.

Lawrence D. Walker, argued, Taft, Stettinius & Hollister, James E. Burke, Cincinnati, Ohio, Angelica D. Lloyd, Norfolk & Western Railway Company, Roanoke, Va., Charles E. Mechem, Consolidated Rail Corp., Philadelphia, Pa., for petitioners.

Mark L. Evans, Gen. Counsel, Ellen K. Schall, argued, I. C. C., Washington, D. C., for respondent I. C. C.

Robert L. Thompson, Dept. of Justice, Washington, D. C., for respondent United States.

Before CELEBREZZE, Circuit Judge, and PHILLIPS and PECK, Senior Circuit Judges.

PECK, Senior Circuit Judge.

The issue in this case is simply whether the Interstate Commerce Commission ("Commission" or "ICC") has the authority to order railroads to carry spent nuclear fuel and low-level reactor wastes at rates prescribed by the Commission. Petitioners are twenty-two eastern railroad companies ("the railroads") which seek relief from the Commission's order compelling them to cancel their abstention, or "flagout," from publication of tariffs for the carriage of nuclear materials. The Commission's order was the culmination of proceedings begun in 1976 when five separate complaints were filed with the Commission against the railroads. The complainants, the Energy Research and Development Administration and numerous eastern utilities companies, alleged that the railroads' continuing refusal to publish rates for the carriage of nucle-

ar materials was in violation of the railroads' statutory duties under the Interstate Commerce Act. Following administrative hearings and findings of fact, the Commission ordered the railroads to "publish reasonable and otherwise lawful tariff provisions covering the transportation of irradiated fuel elements (spent fuel) and radioactive waste." The railroads, by their petition to this Court seek judicial review of this final order under 28 U.S.C. §§ 2321 and 2342. Respondents to the railroads' petition are the United States and the Commission; all but two, of the original complainants have participated in the proceedings before this Court as intervenors.

## I.  COMMISSION'S STATUTORY POWER

The railroads do not deny that the Commission has subject-matter jurisdiction of cases involving the duty of carriers subject to the Act to provide transportation upon reasonable request therefor. Rather, they rely upon *United States v. Pennsylvania R.R.*, 242 U.S. 208, 37 S.Ct. 95, 61 L.Ed. 251 (1916), in arguing that the Commission lacks any statutory power under former 49 U.S.C. § 1(4) (1976)[1] to order carriers to provide such transportation. But the Commission has ordered rate publication, not carriage of goods; it has not exercised any power delegated solely by § 1(4) of the Act. The Commission's authority for its order must therefore be sought in the entire legislative ratemaking scheme for rail carriage.

Since, however, the petitioners see the publication of rates and tariffs as equivalent to a general offer to carry the goods included in the published rate classification, they view the Commission's order as, in effect, an order to carry nuclear materials. It is not disputed that the petitioners have in fact carried these materials as carriers for hire; the effect of the Commission's

order would be to bring this carriage within the Commission's ratemaking purview. Under this statutory ratemaking scheme, the rates proposed by the railroads themselves would be reviewed by the Commission to see if they were reasonable and lawful. 49 U.S.C.A. §§ 10702, 10707 (1979 Supp.).

In light of the petitioners' argument that the Commission's order was grounded on a statutory provision under which only courts have injunctive powers, and in view of the doubt which has recently arisen regarding the Commission's power to order carriers to provide transportation,[2] we feel some clarifying comment is called for. Such comment must begin with the *Pennsylvania Railroad* case, *supra*, in which the Supreme Court held that the Commission could not order a railroad to augment its supply of tank cars in order to meet an increasing demand by shippers for tank-car services. Since there was no question in the case of discrimination by the railroad in the allocation of the tank cars which it did possess, the Court ruled that the Commission was without statutory authority to order the railroad to acquire more equipment in order to furnish greater services.

The *Pennsylvania Railroad* case is now questionable precedent. The Court's specific ruling was overturned by Congress only one year ·after judgment was rendered. The Esch Act of May 29, 1917, 49 U.S.C. § 1(10) *et seq.* (1976), 40 Stat. 101, empowered the Commission to regulate the supply of rail cars. See H.R.Rep.No.456, 66th Cong., 1st Sess. 17 (1919). Nevertheless, the Commission's own decisions have not limited the *Pennsylvania* case to its facts, but have interpreted it to mean that the Commerce Act gave the Commission no enforcement power under § 1(4). *Cancellation of C.R.I. & P. & Soo Line Rates—Live-*

---

1.  Section 1(4) provided that "[i]t shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefore  . . . ." On October 17, 1978, the Interstate Commerce Act was recodified without substantive change. Substantially identical language to that of

§ 1(4) is now to be found in 49 U.S.C.A. § 11101 (1979 Special Supp.). All subsequent references are to the current codification of the Act.

2.  *See, e. g., Winnebago Farmers Elevator Co. v. Chicago & N.W. Transp. Co.,* —— I.C.C. ——, F.D. No. 28412 (March 29, 1978).

_stock,_ 340 I.C.C. 463 (1972); _Duralite, Inc. v. Erie Lackawanna Ry.,_ 229 I.C.C. 312 (1971). The effects of such an interpretation of the _Pennsylvania_ case were lessened, however, by the Commission's development of the "simultaneous involvement" doctrine, under which the Commission has ancillary jurisdiction of cases involving failure to provide service whenever other sections of the Act are "simultaneously involved." _Soo Line Rates, supra._ Recently the Commission has overruled its earlier holdings and ruled that the _Pennsylvania_ case is no longer binding precedent. _Winnebago Farmers Elevator Co. v. Chicago & N.W. Transp. Co.,_ —— I.C.C. ——, F.D. No. 28412 (March 29, 1978). We need not go so far.

We stress again that the petitioners challenge the Commission's power to issue an order under former § 1(4) of the Act, not the Commission's subject-matter jurisdiction. Apart from the beleaguered _Pennsylvania_ case, they rely in this challenge on _ICC v. United States ex rel. Los Angeles,_ 280 U.S. 52, 50 S.Ct. 53, 74 L.Ed. 163 (1929), in which the Supreme Court held that the Commission did not have the power, under a section of the Act requiring carriers to provide "reasonable facilities," to order railroads to construct a terminal building. The Court found particular significance in the lack of an express statutory grant of such power.

Neither of the cases relied on by petitioners dealt with the Commission's ratemaking power—the power on which its presently challenged order must be based. Review of the Act shows the power of the Commission in ratemaking is extensive; the Act provides that:

> (a)(1) When the Interstate Commerce Commission, after a full hearing, decides that a rate charged or collected by a carrier for transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title, or that a classification, rule, or practice of that carrier, [_sic_] does or will violate this subtitle, the Commission may prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or

> practice to be followed. _The Commission may order the carrier to stop the violation._

49 U.S.C.A. § 10704 (1979 Supp.) (emphasis added).

■ Exclusion of a commodity from a carrier's published tariffs, as under the petitioners' flagout, is clearly a "classification" of that commodity within the meaning of that term under the Act. _See Director General of Railroads v. Viscose,_ 254 U.S. 498, 41 S.Ct. 151, 65 L.Ed. 372 (1921). We therefore hold that the Commission's order that the railroads cancel their "flagout" was within the powers granted the Commission under the Act.

The provisions of the Act offer little support for the railroads' contention that, in their capacity as "private," contract haulers of spent fuel and reactor wastes, they are not subject to the ratemaking jurisdiction of the Commission. First, the Commission has general jurisdiction over interstate transportation by railroad. 49 U.S.C.A. § 10501(a)(1)(A) (1979 Supp.). Second, a carrier subject to the Commission's jurisdiction must publish rates for the transportation it provides. _Id._ § 10702(a)(1). No carrier providing transportation subject to the Commission's jurisdiction may do so unless a rate for the transportation or service is contained in a current tariff. _Id._ § 10761(a).

The Supreme Court has given full recognition to the primary jurisdiction of the Commission both in ratemaking, _Arrow Transp. Co. v. Southern Ry.,_ 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); _Texas & Pacific Ry. v. Abilene Cotton Oil Co.,_ 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), and in the classification of goods for tariff purposes. _United States v. Western Pacific R. R.,_ 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The uniformity of rates and expertise in ratemaking sought by this grant of primary jurisdiction would be thwarted if it were held that only a court could order the publication of rates and tariffs for transportation which a carrier had already been providing.

We can only conclude that the petitioners were, in their carriage of nuclear materials, within the Commission's ratemaking jurisdiction. When a Commission order for publication of rates is directed at carriers already extensively engaged in the carriage to be regulated, such an order is simply not analogous to the orders to provide additional services which were struck down by the Supreme Court in the *Pennsylvania* case and *ICC ex rel. Los Angeles, supra.* The present case, unlike those two, may only correctly be seen as a ratemaking case, in which the Commission must and does have extensive powers.

## II. COMMON CARRIERS

■ Analysis of the railroads' statutory obligations has been considerably hampered by the petitioners' attempts to encrust common-law concepts onto the Act's straightforward provisions. While it is obvious that the Act codified the common-law obligations of railroads as common carriers, *American Trucking Ass'n v. Atchison, T.&S.F. Ry.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), this does not mean that the Act created no purely statutory obligations of rail carriers. We are fully aware that "[t]here is no doubt that common carriers, subject to the Interstate Commerce Act, may have activities which lie outside the performance of their duties as common carriers and are not subject to the provisions of the Act." *Kansas City So. Ry. v. United States,* 282 U.S. 760, 764, 51 S.Ct. 304, 306, 75 L.Ed. 684 (1931) (citations omitted). Unlike the counsel for the railroads, however, we have read the next sentence in this last-cited opinion: "But a common carrier dealing with transportation that is subject to the Act cannot escape its statutory obligations by calling itself a private carrier as to such transportation." *Id.* It may be true that only carriers who "held themselves out to the public" were common carriers at common law; but this does not override the clarified Commerce Act's definition of common carrier as including railroads.

The railroads do not argue that they are not common carriers under the Act; they assert only that they are not common carriers "as to" spent fuel and reactor wastes, because they have never published tariffs and rates for the carriage of these commodities. Thus, by the railroads' reasoning, while they may widely carry spent fuel and low-level wastes pursuant to individual contracts with numerous shippers, they would not be common carriers with statutory obligations in this carriage, so long as the contracts of carriage stated that they are not to be read as a "holding out to the public" of the railroads as common carriers of nuclear materials.

It is true that at common law carriers could pick and choose the goods which they would transport in common carriage; but even at common law, railroad companies, "whose property and facilities are affected with a public interest, [were] ordinarily held to be common carriers of goods delivered to them for transportation . . . ." 13 C.J.S. *Carriers* § 6. In many jurisdictions railroads are declared by statute, as they are presently under the Interstate Commerce Act, to be common carriers. 13 Am. Jur.2d *Carriers* § 11. The Act's declaration of the common-carrier status of railroads is not an unjust one, in view of the governmental largess which railroads have received,[3] and in view of the unique importance to commerce of rail transportation.

There are exceptions to the general statutory common-carrier obligations of railroads; but the activities which "lie outside" a carrier's duties under the Act are limited. To give but a few examples: transportation at reduced rates of employees and supplies of a construction company working under contract for a railroad is not a rate discrimination in violation of the Act. *Santa Fe Ry. v. Grant Bros.,* 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787 (1913). A railroad has no statutory duty to carry sterling and gold-

---

**3.** Petitioner Rock Island & Pacific R.R. had, for example, prior to these proceedings, gotten a loan from the Federal Government of approxi-

mately $17 million. Congress has appropriated over $2 billion for loans to petitioner Conrail.

ware, when it has never carried the articles before, and more appropriate alternative carriage is available. *Emporium v. New York Cent. R. R.*, 214 I.C.C. 153 (1936). "Limited and special services" may be provided at less than legal freight rates upon the request of shippers of a unique commodity such as a circus train. *Transportation of Circuses and Show Outfits*, 229 I.C.C. 330 (1956).

Petitioners place great reliance on the common law's recognition that efficiency of carriage is sometimes best served by allowing carriers to limit their extensive common-carrier liability for damage to goods transported. In such cases, a common carrier was seen to act as a "private carrier, or bailee for hire"—confusing language, perhaps, to describe a contractual exception to carriers' common-law duties. But even at common law, a carrier could not put off its common-carrier status by mere contractual provision. An early Supreme Court opinion rejected such formalism:

> The theory occasionally announced, that a special contract as to the terms and responsibilities of carriage changes the nature of the employment, is calculated to mislead. The responsibilities of a common carrier may be reduced to those of an ordinary bailee for hire, whilst the nature of his business renders him a common carrier still. Is there any good sense in holding that a railroad company, whose only business is to carry passengers and goods, and which was created and established for that purpose alone, is changed to a private carrier for hire by a mere contract with a customer, whereby the latter assumes the risk of inevitable accidents in the carriage of his goods[?]

*New York Cent. R. R. v. Lockwood*, 84 U.S. 357, 376, 17 Wall 357, 21 L.Ed. 627 (1873). *Accord, Liverpool Steam Co. v. Phenix Ins. Co.*, 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788 (1889).

■ Petitioners argue that the existence of such contracts renders them "private,"

and not common carriers. We recognize that "[a] common carrier may, undoubtedly, become a private carrier, or a bailee for hire, when, *as a matter of accommodation or special engagement*, he undertakes to carry something which it is not his business to carry." *Lockwood, supra*, at 84 U.S. 377; *Phenix, supra*, at 129 U.S. 440, 9 S.Ct. 469 (emphasis added). Thus, for example, an extraordinary contract to transport a special circus train at reduced rates, with limitations on liability for damages, may be enforceable, when the contract is not against public policy. *Chicago, M. & St. P. Ry. v. Wallace*, 66 F. 506 (7th Cir. 1895). As a matter of special engagement, a railroad may "privately" carry precious metals for the United States Government, and may recover the contractual transport fee in an action at law. *United States v. Louisville & Nashville R. R.*, 221 F.2d 698 (6th Cir. 1955).

■ Several of the petitioners have, like the plaintiff in the *Louisville & Nashville* case, carried goods for the Government under "§ 22"[4] rate quotations. Following the rule of the *Louisville & Nashville* case, we must disagree with the administrative law judge's conclusion in the present case that the mere quoting of rates for the transport of commodities under the former § 22 of the Act renders subsequent transport of the same commodities for private shippers subject to all of the Act's provisions. Rather, it is the long history of the present petitioners' carriage of nuclear materials, and the continuing national need for such carriage, which takes the petitioners' transport of nuclear materials from the realm of "accommodation or special engagement" where the Act's ratemaking provisions do not apply.

By the year 1985, the record shows, one quarter of the electric power used in the United States may be produced by nuclear fission reactors. The spent fuel from these reactors must be transported for reprocessing, and the low-level reactor wastes, such as radiation-contaminated work clothing,

---

4. The former 49 U.S.C. § 22 allowed common carriers to furnish transportation to the United States Government at fees less than those pre-

scribed under published rates. *See* 49 U.S.C.A. § 10721 (1979 Supp.).

must be transported for disposal. No other mode of transportation is more suited to the economical carriage of these materials than train carriage, according to the findings of the Commission. And it is the Commission which has primary jurisdiction to execute the National Transportation Policy's mandate "to recognize and preserve the inherent advantage of each mode of transportation . . . ." 49 U.S.C.A. § 10101 (1979 Supp.); *see, e. g. Arrow Transp. Co. v. Southern Ry.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

The Commission has found that truck shipment of nuclear wastes would, because of the greater number of smaller shipments required, increase the probability of accidents involving nuclear materials, and, even if no mishap occurs, result in greater exposure to radiation of transportation workers and the general populace. If the Congressional delegation to the Commission of power to implement the National Transportation Policy is to be effective, the Commission must have the statutory authority exercised by its order; we further conclude that the Commission's preference of rail over truck carriage of spent fuel is both within the Commission's primary jurisdiction and supported by substantial evidence.

The railroads' common-carrier duties in the carriage of nuclear materials must be seen to flow from their role in effecting the National Transportation Policy. These duties are not dependent upon railroads' characterization of themselves as "private" carriers in contracts of carriage, nor upon their supposedly conscious refusal to "hold themselves out" for carriage of nuclear materials. This "holding out" may have indeed been one of the earmarks of common carriers at common law; but in the almost one hundred years since the passage of the Act there has developed a new "common" law of transportation under which the public duty of railroads has been broadened beyond that extant under the common law of carriers. It is not only "common carriage," but transportation which is subject to the Act and to the Commission's statuto-

ry powers. *See, e. g., Cincinnati, N. O. & T. P. Ry. v. Chesapeake & O. Ry.*, 441 F.2d 483 (4th Cir. 1971); *Republic Carloading Co. v. Missouri Pacific R. R.*, 302 F.2d 381 (8th Cir. 1962) (per Blackmun, J.). A carrier's statutory duties run not to shippers alone, but to the public. *Brotherhood of Ry. Clerks v. Florida E. C. Ry.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966). Therefore, public needs must shape the boundaries of these duties.

### III. THE SAFETY ISSUE

The petitioners' second basic contention is that the Commission failed to consider sufficiently the safety of the carriage of nuclear materials by the *particular* railroads which were before the Commission. The railroads argue that the commodities involved in this case have a unique potential for harm in the event of a rail accident; petitioners have even trumpeted their "lamentably poor" safety records in order to convince the Commission that petitioners were not fit for the regular carriage of reactor wastes, and that they could safely undertake carriage of nuclear materials only under private contracts. A typical private contract would contain clauses: (1) making service at the will of the carriers; (2) limiting the carrier's own liability in case of rail mishaps involving nuclear materials; (3) obliging the shipper to obtain connecting-line rail service; and (4) requiring special train service for the carriage of reactor wastes. The special trains in this service would comprise less than five cars, and would move only at low speeds over specially designated routes.

The Commission has already considered the advisability of special trains for the transport of spent nuclear fuel. In *Radioactive Materials, Missouri-Kansas-Texas R. R.*, —— I.C.C. ——, No. 3607, Feb. 24, 1978 ("MKT case"), the Commission ordered the MKT to cancel its flagout from tariffs for the carriage of nuclear materials. The purpose of the flagout was to allow the railroads to charge rates enabling it to carry nuclear materials . in special trains only. The Commission relied on *Delta Air Lines,*

*Inc. v. CAB,* 177 U.S.App.D.C. 100, 543 F.2d 247 (D.C.Cir.1976), in holding that its inquiry into the risks involved in the transport of nuclear materials must be limited to determining if the shipments meet the requirements of the Department of Transportation ("DOT") and the Nuclear Regulatory Commission ("NRC"). The Commission viewed a carrier's general assertion that shipments meeting DOT and NRC safety standards might be too hazardous to transport as an impermissible "collateral attack" on the regulations of DOT and NRC.

The Commission's position is understandable in light of the transfer in 1966 of the power to regulate the safety of carriage of radioactive materials from the Commission to DOT. 18 U.S.C. §§ 831–35; 49 U.S.C. § 1655(e)(4) (1976). In 1975 the Hazardous Materials Transportation Act delineated the Secretary of Transportation's rulemaking powers in the transport of dangerous commodities:

> (a) Such regulations may govern any safety aspect of the transportation of hazardous materials . . . including, but not limited to, the packing, repacking, handling, labeling, marking, placarding, and routing (other than with respect to pipelines) of hazardous materials, and the manufacture, fabrication, marking, maintenance, reconditioning, repairing, or testing of a package or container which is represented, marked, certified, or sold . . . for use in the transportation of certain hazardous materials.
>
> (b) Cooperation. In addition to other applicable requirements, the Secretary shall consult and cooperate with representatives of the Interstate Commerce Commission and shall consider any relevant suggestions made by such Commission, before issuing any regulations with respect to the routing of hazardous materials. Such Commission shall, to the extent of its lawful authority, take such action as is necessary or appropriate to implement any such regulation.

A second case in which the Commission considered the safety of rail transport of spent fuel and reactor wastes was *Radioactive Materials, Special Train Service, Nationwide,* —— I.C.C. ——, No. 36325, March 8, 1978. In that case, four railroads sought approval of proposed tariffs which would have made special train service mandatory for the transport of nuclear materials. The Commission, in ruling on its jurisdiction in safety matters, clarified the meaning of its holding in the MKT case. The Commission's deference to the safety regulations of its sister agencies must extend only this far: a carrier may not ask the Commission to take cognizance of a claim that a commodity is absolutely too dangerous to transport, if there are DOT and NRC regulations governing such transport, and these regulations have been met.

Such a claim is properly made before the agencies entrusted with promulgating these minimum safety regulations.[5] "A carrier thus cannot refuse to haul any materials which meet [DOT and NRC] standards, but it may seek approval of a stricter practice which is shown to be just and reasonable." *Special Train Service case, supra,* slip op. at 4. We hold that the Commission has properly stated its role in regulating safety standards for rail transport of nuclear materials. It is entirely possible that, after the petitioners have published tariffs under which special trains would be required to haul these commodities, the Commission would approve tariffs and rates which would enable the individual railroads involved in *this* proceeding to provide special trains to carry nuclear materials, even though such special trains might not be required nationwide. In the Commission's review of the reasonableness of such proposed rates, numerous factors might be found distinguishing the eastern railroads from their counterparts elsewhere. Such factors might include: the frequency of the demand for carriage of nuclear materials in petitioners' territories; the amount of rail

---

5. We cannot refrain from noting at this point that none of the petitioner railroads has availed itself of opportunities to comment upon the safety regulations of DOT and NRC concerning the rail transport of nuclear materials.

traffic in the areas served; the population density in the areas served; and track conditions and safety records of the railroads involved. These factual matters are properly to be explored after the publication of tariffs for the carriage of nuclear materials, not in deciding whether such publication should be ordered.

Questions of safety are also questions of risk of liability. A question of possible liability for damage resulting from carriage of a commodity is therefore within the Commission's jurisdiction as the regulator of the economics of interstate rail transport. We agree with the petitioners' statement that while DOT and NRC have exclusive authority to promulgate *industry-wide* standards for the carriage of radioactive materials, the ICC may allow *individual* carriers to make more (but not less) stringent rules for their own carriage of hazardous materials. This is in total agreement with the position taken by the District of Columbia Circuit in describing the safety jurisdiction of the Civil Aeronautics Board in *Delta Air Lines, supra,* which is analogous to the present case:

> Perhaps . . . the Board retains a small residue of authority over safety issues whereby it could impose hazardous cargo standards stricter (but not more lenient) than those of FAA/DOT, yet in general we believe that the Board should defer to the safety expertise of its sister agencies and accept the FAA/DOT positions on safety as establishing both an inner and an outer limit on its safety jurisdiction.

543 F.2d at 260 (D.C.Cir.1976) (footnote omitted).

In light of the Commission's eighty-year-plus history of sole jurisdiction of railroad safety standards, the gap in safety expertise between DOT and the Commission must be presumed to be less than that between the FAA and CAB. The CAB had exercised jurisdiction of aviation safety matters for barely twenty years prior to the creation of the FAA. *See* Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.*[6] (1976), 72 Stat. 737; Civil Aeronautics Act of 1938, 52 Stat. 973. Accordingly, the comparison of the CAB with the ICC is not a perfect one; the Commission has more than a "small residue of authority over safety matters," as is evidenced by the statutory requirement that DOT confer with the Commission on the routing of rail shipments of hazardous materials.

For the reasons stated above, we conclude that the Commission had the statutory authority to order the eastern railroads to publish tariffs for the rail transportation of spent nuclear fuel and low-level reactor wastes. We further conclude that the Commission gave proper consideration to safety evidence offered by the railroads in justification of their never having published such rates. The petition of the railroads is therefore denied, and the Commission's order to publish rates affirmed.

---

**6.** Since 1976, the Federal Aviation Act has twice been the subject of amendments not material to the analogy drawn above. *See* 49 U.S.C.A. § 1301 *et seq.* (1979 Supp.)