**CONSOLIDATED RAIL CORPORATION et al., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**BURLINGTON NORTHERN INC. et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**Nos. 80–1804, 80–1843.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 26, 1982.
Decided Aug. 13, 1982.

Michael Boudin, Washington, D. C., with whom John J. McKetta, III, Austin, Tex., Harry N. Babcock, Cleveland, Ohio, Richard W. Kienle, Roanoke, Va., W. Donald Boe, Jr., Omaha, Neb., and Christopher A. Mills, Washington, D. C., were on the brief, for petitioners. J. Mark Iwry and Joseph D. Anthofer, Omaha, Neb., entered appearances for petitioners.

---

* Of the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. The petitioner railroads in this court are Baltimore & Ohio Railroad Co., Burlington Northern Inc., Chesapeake & Ohio Railway Co., Chicago & North Western Transportation Co., Consolidated Rail Corp., Missouri-Kansas-Texas Railroad Co., Missouri Pacific Railroad Co., Norfolk & Western Railway Co., Southern Pacific Transportation Co., Terminal Railroad Ass'n of St. Louis, and Union Pacific Railroad Co. The "Eastern" and "Western" soubriquets derive from the organizations through which the railroads set their rates pursuant to the antitrust immunity afforded by the Interstate Commerce Act. All petitioners participate in

Henri F. Rush, Associate Gen. Counsel, I. C. C., Washington, D. C., and James H. Laskey, Atty., Dept. of Justice, Washington, D. C., with whom Robert S. Burk, Acting Gen. Counsel, and Ellen K. Schall, Deputy Associate Gen. Counsel, I. C. C., Washington, D. C., and John J. Powers, III, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Before WRIGHT and WILKEY, Circuit Judges, and CELEBREZZE,* Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Concurring opinion filed by Senior Circuit Judge CELEBREZZE.

J. SKELLY WRIGHT, Circuit Judge:

In these consolidated petitions for review eleven of the nation's Eastern and Western railroads [1] seek to set aside an order of the Interstate Commerce Commission (ICC or Commission) determining that they are liable to the United States Departments of Energy and Defense for unreasonable overcharges in connection with shipments of spent nuclear fuel from ports on the east and west coasts to the government's reprocessing facility in Scoville, Idaho. *U. S. Dep't of Energy v. B & O R. Co.*, 364 ICC 951 (1981). The case presents several difficult issues of law, including a question of first impression regarding the ICC's jurisdiction to order reparations of charges paid by the government under "Section 22" quotations, *see* 49 U.S.C. § 10721(b) (Supp. III 1979) (*as amended by* Pub.L.No.96–454,

either the Traffic Executive Association—Eastern Railroads or the Western Railroad Traffic Association. The relevant rates and practices of the members of each rate conference were substantially identical with those of other members in the same conference throughout the period at issue.

In addition to the petitioners in this court, seven other railroads were respondents in the proceedings before the Interstate Commerce Commission. Some of these are participants in the Southern Freight Association. The administrative proceedings below with respect to the Southern Railroads involved facts different from those discussed in this opinion. *See* note 4 *infra*.

§ 10(b), 94 STAT. 2022 (1980)). Nevertheless, we find that this court is without jurisdiction to review the ICC's order on a petition for review under 28 U.S.C. § 2342(5) (1976), and we therefore dismiss the petitions for review without reaching the merits of the railroads' claims. ICC orders which concern nothing more than payment of reparations to a shipper may only be reviewed on a petition for review filed in a United States District Court or in connection with an action to enforce the award brought by the shipper in either a United States District Court or a state court of competent jurisdiction. *See* 49 U.S.C. § 11705(d) (Supp. III 1979); 28 U.S.C. § 1336(a) (1976).

## I. BACKGROUND

Our disposition renders unnecessary an extended discussion of the factual and legal background of the railroads' petitions. Because our decision rests, however, on the nature of the proceeding before the ICC and the posture in which the railroads have raised their claims, some explanation of the claims and the proceedings before the ICC may be helpful.

The Departments of Energy and Defense use a facility in Scoville, Idaho for extracting unused fuel from the fuel rods used in the reactors that power nuclear submarines. Spent fuel rods must be shipped from ports on the east and west seacoasts to the Scoville facility. During the period at issue in this case all of those shipments were made by rail, using specially designed casks mounted on special flatcars. The United States government owns both the casks and the flatcars, and they represent an investment of approximately $175 million.[2] Each

cask weighs approximately 300,000 pounds and holds approximately 15,000 pounds of spent fuel.[3] When the spent fuel rods have been unloaded at Scoville, the casks themselves must be returned by rail to the coastal ports. At issue in this case are petitioners' charges for 31 shipments of spent fuel to Scoville and 39 shipments from Scoville of empty casks, all of which occurred between November 1975 and November 1978.[4]

Spent fuel rods are, of course, highly radioactive, and the interiors of the special casks used to ship the fuel remain radioactive even when the casks are empty. Although these shipments were exempt from Department of Transportation/Nuclear Regulatory Commission regulations regarding transportation of radioactive materials, the casks used are those required by the DOT/NRC safety regulations. In addition, the government required that flatcars bearing the casks must not be left rolling free in switching yards, must not move at speeds in excess of 35 miles per hour, and must be placed at the rear of any train, adjacent to the caboose.[5]

Most of the shipments at issue in this case—including all shipments handled by the Eastern railroads—were made under so-called Section 22 quotations rather than under the class rates for radioactive materials published in the Uniform Freight Classification. Unlike class rates—which are established pursuant to tariffs filed by the railroads, are available to all shippers, and which the ICC may suspend or investigate (subject to applicable jurisdictional qualifications)—Section 22 quotations are available only to the government of the United States (or state and local governments), and they are not subject to the ICC's normal

2. *See* Appendix (App.) 297. *See generally id.* 285–297 (statement of facts in decision of Administrative Law Judge (ALJ)).

3. *Id.* 285.

4. *See id.* 307–308 (Appendices III & IV to ALJ's decision). The proceedings before the ICC also involve shipments of slightly radioactive gear that had been used in handling radioactive material. This was shipped on Western railroads from west coast ports to a waste storage facility in Richland, Washington, or on Eastern and

Southern railroads from east coast ports to a similar facility in Dunbarton, South Carolina. *See id.* 309 (Appendix V). The different facts involved in these shipments have no bearing on this case.

5. *See id.* 173 (Supplemental Verified Statement of R. Garrison). *See also Consolidated Rail Corp. v. ICC*, 646 F.2d 642, 644 n.5 (D.C.Cir.), *cert. denied*, 454 U.S. 1047, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981).

procedures for investigating and reviewing rates.[6] They take their name from former Section 22 of the Interstate Commerce Act, the current version of which states: "A common carrier providing transportation or service subject to the jurisdiction of the Commission * * * may transport property for the United States Government, a State, or municipal government without charge or at reduced rates." 49 U.S.C. § 10721(b)(1) (Supp. III 1979). Section 22 quotations must be filed with the ICC and with the government agency acting as shipper, see id. § 10721(b)(2), but the extent of ICC jurisdiction over them is otherwise unclear.

During the period at issue in this case none of the Eastern railroads offered common carrier service for radioactive materials. They agreed to carry such materials only for the government under standing Section 22 quotations. Most of the Western railroads had tariffs for radioactive materials on file with the Commission which were reflected in the Uniform Freight Classification class rates, but they also offered Section 22 quotations to the government.[7]

In July 1974 the Board of Directors of the Association of American Railroads recommended, "Shipments of casks containing irradiated spent fuel cores should move in special trains containing no other freight * * *."[8] Thereafter, both the Eastern and Western railroads—acting in concert, through their rate conferences—amended their Section 22 quotations to require that all shipments of the special casks move in special trains, whether or not the casks were loaded with spent fuel. In March 1976 the Western railroads amended their tariffs as well to require special trains for shipments of spent fuel, but not of empty casks. Shipping under the Section 22 rates and class rates containing special train requirements, the government paid special

train surcharges of $15 to $20 per mile (with a minimum charge for 110 miles by each railroad participating in a shipment) on each of the shipments at issue in this case.

Four decisions by the ICC in 1977 and 1978 forced the railroads to end their practice of refusing to carry radioactive materials except in special trains. In *Radioactive Materials, Missouri-Kansas-Texas R. Co.*, 357 ICC 458 (1977), and *U. S. Energy Research & Development Administration v. Akron, Canton & Youngstown R. Co.*, 359 ICC 639 (1978), aff'd, 611 F.2d 1162 (6th Cir. 1979), cert. denied, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 34 (1980), it was settled that the railroads had a duty as common carriers to file tariffs covering radioactive materials. More importantly, in the *Special Train Service* decisions, *Radioactive Materials, Special Train Service*, 359 ICC 70 (1978), and *Trainload Rates on Radioactive Materials, Eastern Railroads*, 362 ICC 756 (1980), aff'd sub nom. *Consolidated Rail Corp. v. ICC*, 646 F.2d 642 (D.C.Cir.1981), cert. denied, 454 U.S. 1047, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981), the ICC and this court held that the railroads could not require special trains as a safety measure in their tariffs for radioactive materials because the Department of Transportation and the Nuclear Regulatory Commission had determined that the additional safety provided by special trains was too costly and superfluous in light of other safety measures in their regulations. In affirming the ICC on this point we stated: "[T]he Commission acted properly in finding on this record that STS [special train service] was unnecessary as a safety measure, and that the tariffs based on it were therefore unreasonable." 646 F.2d at 656. As a result of these decisions the railroads no longer require special trains for shipping spent nuclear fuel, either when they carry it under class rates

**6.** See Public Utilities Comm'n of California v. United States, 355 U.S. 534, 543 n.10, 78 S.Ct. 446, 452 n.10, 2 L.Ed.2d 470 (1958); Atchison, Topeka & Santa Fe R. Co. v. Aircoach Transport Ass'n, 253 F.2d 877, 881 & n.9 (D.C.Cir. 1958), cert. denied, 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960). See also Howe v. Allied Van Lines, Inc., 622 F.2d 1147, 1149, 1151–1156

(3d Cir.), cert. denied, 449 U.S. 992, 101 S.Ct. 528, 66 L.Ed.2d 289 (1980).

**7.** See U. S. Dep't of Energy v. B & O R. Co., 364 ICC 951, 961 (1981) (App. 356).

**8.** See App. 324 (Exhibit 58 to Supplemental Verified Statement of R. Garrison).

for private shippers or, apparently, when they carry it for the government under Section 22 quotations.

In November 1978, shortly after the ICC issued its first *Special Train Service* ruling, the Department of Energy initiated this proceeding by filing a complaint with the Commission seeking reparations for all the special train service surcharges it had been forced to pay on shipments of spent fuel and empty casks within the three-year statute of limitations. In relevant part the government's complaint asked the ICC to:

> Order that the special train charges assessed against, demanded or collected from and paid by complainants, or any other agency or governmental office on their behalf, * * * are and were unlawful, and that such charges, plus interest, be paid to complainants as damages * *[.]

Appendix (App.) 11. The railroads, in turn, raised several defenses to the government's claim for damages. They challenged the ICC's jurisdiction to review the reasonableness of Section 22 quotations and award reparations for shipments that moved under Section 22 quotations, they asserted that the government was estopped to seek damages on the shipments at issue because it had accepted the Section 22 quotations and had not availed itself of the modification procedure established in the quotations themselves, and they questioned the equity of awarding reparations to the government when it had already received the benefit of special train service. Furthermore, they argued that the government-imposed safety measures—primarily the 35 mph speed limit—made special train service a necessity, not only as a safety measure (for that argument had been rejected in the *Special Train Service* rulings), but to preserve the integrity of the railroads' scheduling systems.[9]

9. *See id.* 291–294 (ALJ's decision).

10. *See U. S. Dep't of Energy v. B & O R. Co., supra* note 7, 364 ICC at 960–975 (App. 355–370); App. 344 (Division 2 affirmance of ALJ's findings); *id.* 298–304 (ALJ's decision).

11. *See* 364 ICC at 978–979 (App. 373–374). Rule 95, in pertinent part, provides:

An administrative law judge (ALJ), ·the ICC's Division 2, and then the full Commission ruled in favor of the government. All agreed that the special train charges were an unreasonable increment to the already-generous rates charged by the railroads on shipments of radioactive material and that the ICC had jurisdiction to award compensation to the government for unreasonable overcharges on shipments that moved under Section 22 quotations.[10] The ALJ and one commissioner thought that reparations should be awarded only on shipments occurring after the ICC's first *Special Train Service* decision, but a majority of the Commission held that the railroads were liable to the government for all special train charges imposed on government shipments within the Interstate Commerce Act's three-year statute of limitations, 49 U.S.C. § 11706(b) (Supp. III 1979). The Commission's final order stated a measure of damages for four categories of shipments at issue in this case: (1) shipments carried by the Western railroads under class rates (with special surcharges), (2) shipments carried by the Eastern railroads under Section 22 quotations (for which no class rates were in existence), (3) shipments carried by the Western railroads on which the Section 22 quotation without special train charges was lower than the applicable class rate without special train charges, and (4) shipments by the Western railroads on which the Section 22 quotation without special train charges was higher than the applicable class rate without special train charges. The Commission ordered the parties to file a statement under its Rule 95, *see* 49 C.F.R. § 1100.95 (1981), showing shipments that came within its order and the amount of reparations due on each shipment.[11]

> When the Commission finds that damages are due, but that the amount cannot be ascertained upon the record before it, the complainant should immediately prepare a statement showing details of the shipments on which damages are claimed * * *. * * * The statement, together with the paid freight bills on the shipments, or true copies, thereof, should then be forwarded to the carrier which collected the charges, for vertification

In their petitions for review the railroads renew most of the arguments they made before the Commission, and they also argue that the Commission's failure to make a finding of "market dominance"—a statutory prerequisite to its jurisdiction to set maximum rates, see 49 U.S.C. § 10709 (Supp. III 1979) (as amended by Pub.L.No. 96–448, § 202, 94 STAT. 1900 (1980))—renders the ICC's award of reparations invalid. The United States has moved that these petitions for review be dismissed. First, it argues that the order is not "final" within the meaning of 28 U.S.C. § 2342(5) (1976) until the Rule 95 procedure has been completed and a specific sum of damages has been fixed. Second, it claims that the ICC's order is outside the jurisdiction of the Court of Appeals on a petition for review because it is an order solely for payment of money, direct review of which is only proper in a District Court, see id. § 1336(a).

## II. JURISDICTION

This court's direct review jurisdiction over ICC orders is governed by 28 U.S.C. § 2342 (1976), which states simply:

The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

* * * * * *

(5) all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title.

Section 2321, in turn, provides that all proceedings to enjoin or set aside ICC orders shall be brought in the Court of Appeals, "[e]xcept as otherwise provided by an Act of Congress * * *." Id. § 2321(a). The principal exception to jurisdiction in the Court of Appeals is Section 1336(a) of the same title, which states:

Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission, and to enjoin or suspend, in whole or in part, any order of the Interstate Commerce Commission for the payment of money or the collection of fines, penalties, and forfeitures.

Id. § 1336(a); see Aluminum Co. of America v. ICC (Alcoa), 553 F.2d 1268, 1269 (D.C. Cir.1977).

This allocation of authority to review ICC orders first appeared in Pub.L.No.93–584, 88 STAT. 1917 (1975), which substituted direct review in the Courts of Appeals for three-judge District Court review of ICC orders other than those for payment of money. The 1975 Act did not expand or contract the jurisdiction of single-judge District Courts, but merely replaced the cumbersome three-judge District Court procedure with the increasingly familiar procedure of direct review in the Courts of Appeals. See Alcoa, supra, 553 F.2d at 1269–1270. Accordingly, this court has jurisdiction over the railroads' petitions for review only if, before 1975, they would have required constitution of a three-judge District Court. Genstar Chemical Ltd. v. ICC, 665 F.2d 1304, 1307 (D.C.Cir.1981), cert. denied sub nom. Nitrochem, Inc. v. ICC, —— U.S. ——, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982); Alcoa, supra.[12]

[sic] and certification as to its accuracy. * * All discrepancies, duplications, or other errors in the statements should be adjusted by the parties and corrected agreed statements submitted to the Commission. The certificate must be signed in ink by a general accounting officer of the carrier and should cover all of the information shown in the statement. * * * Statements so prepared and certified shall be filed with the Commission whereupon it will consider entry of an order awarding damages.

49 C.F.R. § 1100.95 (1981). The rule is intended to provide a practical, expeditious method

by which parties may reach agreement on the exact amount of a damage award. If the parties fail to agree, the ICC may conduct further formal proceedings on the issues in dispute. See Sloss-Sheffield Steel & Iron Co. v. Louisville & Nashville R. Co., 60 ICC 595, 596 (1921), aff'd, 269 U.S. 217, 226–227 & n.2, 46 S.Ct. 73, 76 n.2, 70 L.Ed. 242 (1925); E. ANDERSON, ICC PRACTICE AND PROCEDURE 206–207 (1966).

12. Both Genstar and Alcoa also emphasized that the jurisdictions of the Courts of Appeals and the District Courts under the present scheme are mutually exclusive. See 665 F.2d

The Supreme Court discussed the pre-1975 question of single-judge *versus* three-judge District Courts in *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), and *ICC v. Atlantic Coast Line R. Co.*, 383 U.S. 576, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966). In *United States v. ICC* the Court held that orders denying damages were reviewable only in a single-judge District Court, because "the root of the controversy concerns the payment of money damages," 337 U.S. at 443, 69 S.Ct. at 1419. The Court explained that the purpose of providing three-judge District Court review of certain ICC orders—with an attendant right of direct appeal to the Supreme Court—was "expedition of final determination of the validity of certain types of Commission orders." *Id.* at 441, 69 S.Ct. at 1419. It continued:

> This expedition was sought for orders of national or wide spread interest, such, for example, as railroad rate orders. Congress saw the necessity for an accelerated appellate procedure to prevent railroads from nullifying the effect of such orders in prolonged litigation. * * * [T]he same expedition necessary in cases affecting the public generally was not necessary in other kinds of cases involving "local and isolated questions which arise in the ordinary courts."
>
> \*     \*     \*     \*     \*     \*
>
> * * * *[O]rders relating merely to the payment of money are not likely to be of sufficient public importance to justify use of the three-judge procedure.* * * * The Urgent Deficiencies Act * * * indicates the belief of Congress that *such orders are not of sufficient public importance to justify the accelerated judicial review procedure.*

*Id.* at 441–442, 69 S.Ct. at 1418–19 (emphasis added; footnotes omitted). Where "[o]nly the method or amount of payments currently to be made would be affected" and "[t]here is no danger of temporarily interrupting * * * service," the Court would not presume that Congress intended the special review procedures to apply. *United States v. Griffin*, 303 U.S. 226, 234, 58 S.Ct. 601, 605, 82 L.Ed. 764 (1948); *see United States v. ICC, supra*, 337 U.S. at 442, 69 S.Ct. at 1419 (citing *Griffin*).

In *ICC v. Atlantic Coast Line R. Co., supra*, the Court discussed the statutory scheme for review of ICC orders granting reparations. Then, as now, the statute provided two types of actions in which the courts could review ICC orders: actions to enforce orders for payment of money, and actions to enjoin, suspend, or set aside ICC orders. The former were available only to shippers whose claims for damages had been adjudicated and accepted by the ICC, and shippers bringing enforcement actions had the benefit of several important procedural advantages, including choice of venue, the option to seek enforcement in state courts, and a right to attorney fees and costs if their actions were successful. Both shippers and carriers could bring actions to enjoin, suspend, or set aside ICC orders, and in those cases the party adversely affected by the Commission's order chose the forum in which the case would be heard.

The *Atlantic Coast Line* Court held that "both the [enforcement] action and the [action to enjoin, etc.] may be heard and determined by a single district judge when the reparation order is not accompanied by a cease-and-desist order." 383 U.S. at 596–597, 86 S.Ct. at 1013. It also stated that "if the Commission's reparation order is accompanied by a cease-and-desist order, as it usually will be when the proceeding originates before the Commission and the rates or practices under attack continue in use, the carrier may obtain immediate review of the cease-and-desist order," presumably in a three-judge District Court. *Id.* at 586, 86 S.Ct. at 1007. But the Court emphasized that, when the ICC had done nothing more

---

at 1307; 553 F.2d at 1270. Nevertheless, the Courts of Appeals may review ICC reparations orders when they accompany other orders, such as cease-and-desist orders or ratemaking orders. *See, e.g., Bangor & Aroostook R. Co. v. ICC*, 574 F.2d 1096 (1st Cir.), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978). *See generally ICC v. Atlantic Coast Line R. Co.*, 383 U.S. 576, 586, 86 S.Ct. 1000, 1007, 16 L.Ed.2d 109 (1966).

than grant a shipper the right to damages, the statutory scheme required that review of the ICC's order could only be had in the court selected by the shipper. Aggrieved carriers could attack the validity of the Commission's order in that forum, and they could join the United States as a party in order to obtain effective review of the Commission's order, but they could not nullify the shippers' rights—to select the forum for review and to receive fees and costs if they prevailed—by filing their own petitions for review in forums of their choice. *See id.* at 602–603, 86 S.Ct. at 1015–16.

*Atlantic Coast Line* and *United States v. ICC* compel the conclusion that, over the years, Congress has distinguished between "orders relating merely to the payment of money" by regulated carriers and other ICC orders (such as cease-and-desist orders or orders setting rates) which generally affect current rates. Federal court review of the first type of order may only be sought in a District Court. The shipper will either have an order for damages that it can seek to enforce in state or federal court, *see* 49 U.S.C. § 11705(d) (Supp. III 1979), or it will be the party adversely affected by an order denying damages. In both events the shipper initiates the action, and any judgment entered is subject to normal review procedures in the appellate courts and the Supreme Court. The second type of order, on the other hand, is reviewed directly by the United States Court of Appeals, in a circuit chosen by the party adversely affected, shipper or carrier. Because only two levels of judicial review rather than the normal three levels are available, final disposition of cases involving the second type of order is generally swifter than that of cases involving the first type of order.

It is important to note where Congress and the Supreme Court have not drawn the line between orders reviewable only in the District Courts and those directly reviewable in the Courts of Appeals. The nature of the ICC's order, not the difficulty, novelty, or general importance of the legal questions raised by the order, controls the question of review jurisdiction. Orders of both types may raise difficult questions of interpretation, whether of broad interest to the general public or affecting only a narrow class of shippers.[13] Congress' judgment that "orders relating merely to the payment of money are not likely to be of sufficient public importance" to justify direct review in the Courts of Appeals, *see United States v. ICC, supra,* 337 U.S. at 442, 69 S.Ct. at 1419, is not—nor could it have been meant to be—a precise description. The distinction between ICC orders and the courts in which they must be reviewed in the first instance relates only roughly to the abstract importance of the ICC's determinations. Rather, it reflects the general likelihood that expedited and abbreviated judicial review will be in the interest of the parties involved and the public at large, and it embodies a congressional decision that shippers rather than carriers should be able to select the forum in which reparations orders will be reviewed.

Thus in *Genstar Chemical Ltd. v. ICC, supra,* this court held that, with respect to an ICC reparations proceeding,

any public interest in the Commission order or in a ruling in this case that exists only because of their value as precedent is not the sort of "widespread interest" to which the Supreme Court was referring in *United States v. ICC.* * * *

13. *Compare, e.g., Petition for Declaratory Order—Livestock and Poultry Feed Exemption,* 132 MCC 535 (1981), *aff'd mem. sub nom. Dahlsten Truck Line, Inc. v. United States,* 673 F.2d 551 (D.C.Cir.1982) (ICC declaratory order that pet food was not within definition of "livestock and poultry feed" reviewed by Court of Appeals), *with Quaker State Oil Refining Corp. v. United States,* 465 F.Supp. 75 (W.D.Pa.1979) (District Court had jurisdiction to review ICC order denying reparations on the ground that "slack wax" was not within the Uniform

Freight Classification definition of "lubricating oil"), *and Bud Antle, Inc. v. United States,* 593 F.2d 865, 867, 870–871 (9th Cir. 1979) (District Court had jurisdiction to review denial of reparations based on Commission's interpretation of its powers under form § 15(13) of the Interstate Commerce Act). In *Genstar* this court held that jurisdiction was proper in the District Court even though the ICC's reparations order placed the "fundamental remedial powers" of the Commission at issue. *See* 665 F.2d at 1308.

665 F.2d at 1308, *aff'g,* 491 F.Supp. 391, 395 (D.D.C.1980). Our decision in *Genstar* is highly relevant to the jurisdictional question in this case. The shipper in *Genstar* had filed a complaint with the Commission seeking reparations from increased rates it had paid on United States-Canada shipments. The ICC had already held in separate proceedings that the carriers' rate increases were unlawful, but it awarded the shipper damages reflecting only the difference between the rates it had paid and the rates it could lawfully have been charged. In its petition for review the shipper challenged the "fundamental remedial powers" of the Commission, asserting that it should have received the difference between the rates it paid and the last lawful rates in effect. We held, despite our appreciation of the importance and breadth of the shipper's arguments, that because the ICC's order did nothing more than grant reparations, the Court of Appeals had jurisdiction to consider the petition for review only on appeal from the District Court. *See* 665 F.2d at 1307–1308.[14]

The question before us, then, is whether the ICC order at issue in this case is an order merely "for the payment of money" and thus not within this court's direct review jurisdiction. As with other questions concerning our jurisdiction to review administrative decisions, we must decide this question with reference to the order's practical function and consequences within the agency's statutory and administrative scheme. *Cf. Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 239 (D.C.Cir.),

*cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) (determination of an order's finality).

The ICC's order in this case simply vacates the earlier opinion issued by its Division 2 and states:

Complainants should file a rule 95 statement. Interest should be computed on the basis of the average yield of 90-day marketable securities for the week in which the first unlawful charge was paid.

364 ICC at 979 (App. 374) (footnote omitted); *see* note 11 *supra* and accompanying text. On its face, therefore, the order does nothing more than declare that the railroads are liable to the government for damages and establish a framework for determining the exact amount of the damages. Reference to the complaint of the Department of Energy, the document that initiated these proceedings, confirms that nothing more than the government's right to damages was at issue before the Commission. *See* pages 690–691 *supra;* App. 11. The government sought only repayment of special train surcharges assessed against it in the past, and nothing in the record indicates that the railroads continued their practice of including special train requirements in their Section 22 quotations after 1978. Elimination of the special train requirements was the collateral but entirely logical result of the ICC's *Special Train Service* rulings, affirmed by this court in *Consolidated Rail Corp. v. ICC, supra,* and it was not compelled by anything in these proceedings.

---

14. Petitioners rely on *Island Creek Coal Sales Co. v. ICC,* 561 F.2d 1219 (6th Cir. 1977). In *Island Creek* the petitioners had sought reparations on the ground that an ICC order doubling demurrage charges, effective only during three months in 1970, was unlawful. The ICC denied the request for reparations, and the Sixth Circuit held that the order rejecting the reparations claim involved "more than mere reparations" because the petitioners had "challenge[d] the fundamental power of the Commission * * * and the method used to promulgate the demurrage increases." 561 F.2d at 1222. Similarly, in a case in which its jurisdiction was not challenged the Seventh Circuit stated that "review of orders denying reparations on legal or policy grounds is available by

petition for review in the courts of appeals." *Empire-Detroit Steel Division of Cyclops Corp. v. ICC,* 659 F.2d 396, 397 (7th Cir. 1981); *cf. Monongahela Power Co. v. ICC,* 640 F.2d 504 (4th Cir. 1981) (denial of reparations on policy grounds reviewed by Courts of Appeals without discussion of jurisdictional question). To the extent that *Island Creek* and *Empire-Detroit* make Court of Appeals jurisdiction dependent on the "legal or policy" basis for an ICC reparations order, they are inconsistent with our holdings in *Genstar* and *Alcoa,* and with the Ninth Circuit's understanding of the law as expressed in *Bud Antle, Inc. v. United States, supra* note 13, 593 F.2d at 867, 870–871. We are bound to follow the law in this circuit as represented by *Genstar* and *Alcoa.*

Of course, to reach its decision on the government's request for damages, the ICC had to make three broad rulings of law. First, it had to hold that it had jurisdiction to consider the unreasonableness of Section 22 quotations and award damages based upon them. As the Commission's opinion and the briefs of the parties to this court indicate, that holding required interpretation—essentially for the first time—of a seldom-litigated statutory provision dating back to the original Interstate Commerce Act. The Commission's decision that it does have such jurisdiction, if affirmed by the courts, may well affect a broad range of dealings between regulated carriers and the United States government. Second, the Commission had to hold that the special train charges had been unreasonable. Although this determination was largely governed by the findings of unreasonableness in the *Special Train Service* cases, it entailed rejecting new arguments raised by the railroads concerning the effect of the government's 35 mph speed limit on train schedules. If the ICC had accepted the railroads' new arguments, the whole issue of special train service for radioactive materials might have been resurrected. Finally, the Commission had to determine whether reparations were appropriate under the equities of the case. At issue was the question whether reparations would ever be appropriate when railroads instituted safety measures in good faith and shippers received the benefit of the measures, even if the additional safety measures were later found too costly.

All of these holdings raise issues for judicial review, and their importance extends beyond the proceedings at hand. Yet the Commission reached each point of law exclusively in the context of considering a claim for damages and nothing more, and the Commission did nothing more than determine a right to damages as the result of its inquiry. In terms of the ICC's regulatory scheme, this case in its present posture is indistinguishable from typical reparations cases. The Commission has ordered the complainant before it to file a Rule 95 statement. This procedure is the final step in most damages cases heard by the Commission. *See* E. ANDERSON, ICC PRACTICE AND PROCEDURE 206–207 (1966). If we were to hold that the Court of Appeals had direct review jurisdiction in this case because of its "widespread interest" affecting the public generally,[15] we would strip all comprehensible meaning from the statutory provision for District Court review of ICC orders for payment of money. Such an interpretation would reduce a statutory scheme that has evolved over 70 years to a mere suggestion by Congress that the Courts of Appeals let District Courts hear all uninteresting or trivial cases. Furthermore, if railroads could seek Court of Appeals review of legal or policy decisions before the Rule 95 process had been completed, they could effectively defeat the shippers' right to seek enforcement in the court of their choice.

Direct review of the reparations orders in the Courts of Appeals is not required to prevent piecemeal or disorderly review of ICC orders. The Interstate Commerce Act provides that all shippers in whose favor an award is made may be joined as plaintiffs in a single District Court action. *See* 49 U.S.C. § 11705(d)(2) (1976). Nor can the fact that the Commission's jurisdiction has been challenged provide a basis for review in this court, for that would invite carriers to evade the statutory scheme for review of reparations orders by raising frivolous jurisdictional arguments. "Jurisdiction" is not a magic word that conjures genies from their lamps or transports a case to a different court, chosen by a different party.

In sum, we decline to adopt a reading of Sections 1336(a) and 2321(a) that makes our jurisdiction depend on the character or the importance of the legal issues raised by an ICC reparations order. The division of review authority enacted by Congress has meaning only if interpreted in light of the greater likelihood that accelerated judicial review will be useful in cases involving

---

**15.** *See* Railroad Opposition to United States' Motion to Dismiss at 13 (*citing United States v.* *ICC*, 337 U.S. 426, 441, 69 S.Ct. 1410, 1418–19, 93 L.Ed. 1451 (1949)).

more than mere damage claims and in light of the policy of letting shippers choose a forum when nothing but damages are at issue. Therefore, we follow *Genstar* and *Aloca* in focusing on the nature of the relief granted (or denied) by the Commission. Where, as here, the ICC has done nothing more than grant a party or parties the right to damages, the Court of Appeals has no direct review jurisdiction over the order.

The petitions for review must be dismissed for want of jurisdiction. All further issues, including any claim that the order in this case is not "final" for purposes of judicial review, must be raised before a court of competent jurisdiction.

*So ordered.*

CELEBREZZE, Senior Circuit Judge, concurring:

This case involves important questions concerning this court's power to review decisions made by the Interstate Commerce Commission. Although I believe that this court may properly decide the issues of broad public importance raised in this appeal, I agree with the majority that the precedent in this circuit requires that these questions be decided initially in the district court. *Genstar Chemical, Ltd. v. ICC,* 665 F.2d 1304 (D.C.Cir.1981), *cert. denied,* ——— U.S. ———, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982).

The railroads raise significant issues in this appeal: whether the Commission may assert jurisdiction over a section 22 arrangement, whether railroads may insist on special train service when the government imposes speed restrictions on the transportation of radioactive materials, and whether the Commission may impose liability on railroads for instituting safety measures in good faith when no definitive decision has been made that such measures are unnecessary. When a petitioner challenges the fundamental power of the Commission and raises questions of significant public importance, the Court of Appeals should provide review. In *Island Creek Coal Sales Co. v. ICC,* 561 F.2d 1219 (6th Cir. 1977), a group of shippers challenged the legality of de-

murrage charges collected under an ICC order. The court found that jurisdiction was properly in the Court of Appeals. The court reasoned that "[a]ttacks on the validity of ICC orders are to be filed in the appropriate court of appeals * * *. Petitioners are seeking more than mere reparations from railroads * * *. They ask for more than money. They challenge the fundamental power of the Commission to issue [the order] and the method used to promulgate the demurrage increases." *Id.* at 1222. *See Empire-Detroit Steel Div. of Cyclops Corp. v. ICC,* 659 F.2d 396, 397 (3d Cir. 1981) ("[r]eview of orders denying reparations on legal or policy grounds is available by petition for review in the Court of Appeals"); *Monongahela Power Co. v. ICC,* 640 F.2d 504 (4th Cir. 1981). *See also Admiral-Merchants Motor Freight, Inc. v. ICC,* 321 F.Supp. 353 (D.Colo.), *aff'd,* 404 U.S. 802, 92 S.Ct. 51, 30 L.Ed.2d 37 (1971) (per curiam).

Furthermore, construing 28 U.S.C. § 1336(a) and 28 U.S.C. § 2324 to allow direct review of these issues in the Court of Appeals would be consistent with the policies Congress intended to foster by allocating responsibility in this area between the district and appellate courts. Where issues of significant public interest are raised, the Court of Appeals should hear the case directly and eliminate the delays and costs of litigation in the district court when the legal issue is certain to come to the Court of Appeals on review of the district court's decision. Any other interpretation simply adds another layer of unnecessary review. *See United States v. ICC,* 337 U.S. 426, 441–42, 69 S.Ct. 1410, 1418–19, 93 L.Ed. 1451 (1949); *Aluminum Co. of America v. ICC,* 553 F.2d 1268 (D.C.Cir.1977). Moreover, direct review in the Court of Appeals of such orders reduces the risk of inconsistent decisions relating to the same order. *See* H.R.Rep.No.93–1569, 93d. Cong., 1st Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 7025, 7033.

Although I believe that this court has the power to review this order directly, the precedent of this circuit requires that this

case be dismissed and brought in the district court. *Genstar Chemical, Ltd. v. ICC, supra.* Even though the petitioner in *Genstar* "challenged the fundamental remedial powers of the Commission," this court determined that the district court had proper jurisdiction. *Id.* at 1308. I reluctantly concur, therefore, in the disposition of this case.